STATE of Alaska, DEPARTMENT OF HEALTH AND SOCIAL SERVICES, DIVISION OF FAMILY AND YOUTH SERVICES; and Tom Cherian, in his official capacity as Acting Director of the Division of Family and Youth Services, Petitioners,

v.

NATIVE VILLAGE OF CURYUNG, on its own behalf and as parens patriai on behalf of its members, and Native Village of Ekwok, on its own behalf and as parens patriae on behalf of its members, Native Village of Kwinhagak, on its own behalf and as parens patriae on behalf of its members, and Chevak Native Village, on its own behalf and as parens patriae on behalf of its members, Respondents.

No. S–11355.

Supreme Court of Alaska.

Dec. 15, 2006.

---

Dan N. Branch, Assistant Attorney General, and Gregg D. Renkes, Attorney General, Juneau, for the Petitioners.

E. Leigh Dickey, James J. Davis, Jr., Nikole Nelson, Alaska Legal Services Corp., Anchorage, and Edward K.M. Bilich, Peter J. Wang, Jonathan Berman, Jones Day, Washington, DC, for the Respondents.

Heather Kendall–Miller, Native American Rights Fund, Anchorage, for Amicus Curiae Kenaitze Indian Tribe, IRA, Native Village of Venetie IRA Tribal Government, Tuluksak Native Community, Mentasta Lake Village, and Sitka Tribe of Alaska.

Before: BRYNER, Chief Justice, MATTHEWS, EASTAUGH, FABE, and CARPENETI, Justices.

*OPINION*

BRYNER, Chief Justice.

## I. INTRODUCTION

Several Alaska Native Villages bring suit under 42 U.S.C. § 1983 against the State of Alaska and the Acting Director of the Division of Family and Youth Services. The villages allege ongoing systematic violations of the Adoption Assistance Act and the Indian Child Welfare Act. The superior court dismissed some of their claims, but denied the state's motion to dismiss all of the villages' claims. The state appeals. We conclude that the villages may bring suit as *parens patriae* under § 1983 to enforce rights that are created by the Adoption Assistance Act and the Indian Child Welfare Act. However, because the villages may not use § 1983 to enforce rights that they possess as sovereigns, the villages' claims on their own behalf may not go forward. And we conclude that although the villages may bring suit against the Acting Director of the Division in his official capacity, they may not sue the state directly. Finally, we note that the state's argument that the villages seek an improper remedy is premature and need not be resolved at this stage of the litigation. We therefore decline to address it.

## II. FACTS AND PROCEEDINGS

The Native Village of Curyung "typically has thirty to forty children who have been removed from their families and placed in State custody."[1] Between them, the Native Villages of Ekwok and Kwinhagak and Chevak Native Village usually have between three and fourteen children in state custody. These villages filed suit on their own behalf and as *parens patriae* on behalf of their members against the State of Alaska, the Department of Health and Social Services,

Division of Family and Youth Services, and Tom Cherian in his official capacity as the division's acting director. They alleged that the defendants systematically violate federal and state laws as well as the federal and state constitutions in the operation of the child welfare system to the detriment of Native children and villages.

### A. Specific Claims in Amended Complaint

In an amended complaint, the villages alleged that the defendants fail to comply with the statutory requirements of the Indian Child Welfare Act,[2] the Multi–Ethnic Placement Act,[3] the Adoption Assistance Act (Adoption Act),[4] four state statutes, and the Due Process Clauses of the Federal and State Constitutions. The villages sought to enforce the rights protected by these statutes and by the federal and state constitutions under 42 U.S.C. § 1983, which allows for suit where the constitutional or statutory rights of a citizen or any person within the jurisdiction of the United States have been violated by any person acting under color of state law.[5]

The villages sought declaratory relief and an injunction in the form of a superior court order appointing "a panel of experts, including Alaska Native members with experience in child welfare issues, with full access to the defendants, their records and their personnel, to develop and oversee the implementation of a plan for reform, to ensure that defendants protect the constitutional and statutory rights of the plaintiff tribes and their members."

The villages alleged that the defendants violate the Indian Child Welfare Act and state law by failing to give notice to the villages as required by the Act "before taking custody of one of their children," and violate the Adoption Act and state law by failing "to provide advance notice to the plaintiff tribes,

---

1. The facts stated here come from the complaint and amended complaint and we assume that they are true for the purposes of this appeal.

2. 25 U.S.C. §§ 1901–1963 (2005).

3. 42 U.S.C. § 622(b)(9) (2005).

4. 42 U.S.C. §§ 620–628, 670–679a (2005).

5. *See Maine v. Thiboutot,* 448 U.S. 1, 100 S.Ct. 2502, 65 L.Ed.2d 555 (1980).

parents, foster parents and children when it moves plaintiffs' children who are in State custody from placement to placement." The villages also alleged that the defendants placed children of plaintiff tribes in settings that do not comply with the Indian Child Welfare Act, in part because defendants "consistently fail to diligently search for available relatives to care for the children of the plaintiff tribes." The villages alleged that the defendants violate the Multi–Ethnic Placement Act by failing "to diligently recruit Native Alaskan foster families." The villages also maintained that "the State does not have enough licensed Native foster families to provide homes for all of the plaintiff tribes' children," and that these children are routinely placed in emergency shelters and group homes outside their villages. The villages alleged that such placements violate the Adoption Act, which requires that children be placed in care that is family-like and least restrictive. The villages also alleged that the state violates the Adoption Act by "failing to provide plaintiffs' special needs children with proper care while in custody," "failing to give preference to relatives when determining placements for plaintiffs' children," "failing to provide procedural protections to the parents and children whenever the State moves plaintiffs' children from one placement to another," and "failing to ensure that foster parents receive the services necessary to address the needs of the plaintiffs' children."

The villages alleged that the state and its officials' practices violate four state statutes: AS 47.10.080(s), AS 47.14.100(e), AS 47.05.065(4), and AS 47.14.115.

Finally, the villages alleged that "[t]he State's systemic failure to comply with state and federal laws in the ... child welfare system violates the due process rights of the plaintiff tribes and their members, as guaranteed by the Fourteenth Amendment to the United States Constitution, by Article I, Sections 1 and 7 of the Alaska Constitution, and by 42 U.S.C. § 1983."

### B.   The Defendants' Motions to Dismiss

The defendants filed two motions to dismiss under Civil Rule 12(b)(6). They argued (1) that the villages lacked standing under a *parens patriae* theory, (2) that the villages were not proper plaintiffs in a § 1983 action, (3) that the defendants were protected by sovereign immunity, (4) that the federal statutes could not be enforced under § 1983, and (5) that the state, the agencies, and Cherian in his official capacity were not proper defendants in a suit based on § 1983.

### C.   The Superior Court's Ruling

The superior court granted the state and its officials' motions in part and denied them in part. It addressed the state's five arguments, the plaintiffs' requested remedy, and whether res judicata barred the villages' claims.

#### 1.   *Parens patriae*

The court first addressed the villages' standing to bring suit as *parens patriae*. It noted that for a sovereign to bring a *parens patriae* action, "the sovereign must assert an injury of a 'quasi-sovereign' interest," and "must establish that a sufficiently substantial segment of its population is affected." The court found that the United States Supreme Court has established that a sovereign's interest "in the health and well-being of residents" is a legitimate quasi-sovereign interest. It reasoned that the villages' interest in their children and in preserving their traditions through those children was "inherently linked to the health, safety and welfare of the Village's members" and therefore qualified as quasi-sovereign interest. The court also found that even though only approximately "fifty-five children and their families are directly affected by the State's actions," those actions indirectly affected the villages' ability to maintain their integrity, which was "something that can only occur through the children of the Village." The court therefore found that the entire community was affected. The court held that the villages have *parens patriae* standing to pursue their claims.

#### 2.   Bringing suit under § 1983

The superior court next addressed whether the villages were proper plaintiffs under § 1983, which creates a cause of action for

violations of federal law. The court noted that, according to the United States Supreme Court holding in *Inyo County v. Paiute–Shoshone Indians*,[6] "[a] tribe may not sue under § 1983 to vindicate its sovereign rights." Here the state argued that "because only sovereigns may bring *parens patriae* actions," the villages' action qualified as an effort to vindicate sovereign rights and was therefore barred by *Inyo County*.

The superior court noted the differences between the right asserted in *Inyo County* and the right asserted here. In *Inyo County*, the tribe claimed that sovereign immunity protected it from a district attorney's efforts to investigate welfare fraud. The tribe therefore "attempted to use its status to undermine an otherwise legal investigation." But the court determined that here the villages "attempt to bring a claim as *parens patriae* for the exact reason § 1983 was enacted: to secure private rights against the wrongful acts of the government." The court therefore determined that the villages' suit was not an attempt to vindicate their sovereign rights, that *Inyo County* did not control the present case, and that the villages could therefore pursue their claim.

### 3. Sovereign immunity

The court next addressed the issue of sovereign immunity. It indicated that although states "have sovereign immunity in their own courts" they can waive that immunity. Moreover, the court noted that the Supreme Court established in *Ex parte Young*[7] that sovereign immunity "does not apply to suits against defendants in their official capacity for prospective injunctive and declaratory relief."

The court found that the state had waived its sovereign immunity for the Adoption Act and Multi–Ethnic Placement Act claims. It reasoned that because the Adoption Act and the Multi–Ethnic Placement Act were legislation authorized by the spending clause of the United States Constitution, they were there-

fore "in the nature of a contract because the state agree[d] to comply with terms in exchange for federal funds." Pointing to the state's waiver of sovereign immunity in all contract and quasi-contract claims,[8] the court concluded that the state had waived sovereign immunity with regard to claims brought to enforce these federal funding "contract[s]." The court determined, further, that as third-party beneficiaries, the villages had standing to enforce those statutes.

In contrast, the superior court found that the state had not waived its sovereign immunity with regard to suits based on the state statutes. Moreover, because *Ex parte Young* does not authorize actions against "state actors being sued for a violation of state law," neither the state nor Cherian could be sued under those laws. The court therefore dismissed all of the state law claims.

The superior court found that the state had also not waived its sovereign immunity with regard to the Indian Child Welfare Act. The court therefore dismissed the claims against the state based on that statute. However, the court determined that the villages could press their claims against Cherian since *Ex parte Young* authorizes claims against state officials for violations of federal law.

### 4. Whether the federal statutes created rights enforceable under § 1983

Having disposed of the sovereign immunity issue, the court addressed the state and its officials' next issue: whether the Indian Child Welfare Act, the Multi–Ethnic Placement Act, and the Adoption Act create rights that could be enforced under § 1983.

The superior court concluded that §§ 1912(a) and 1915(b) of the Indian Child Welfare Act create enforceable rights. Because the "[Indian Child Welfare Act] does not contain a remedial scheme that is sufficiently comprehensive to exhibit Congress'

---

**6.** 538 U.S. 701, 712, 123 S.Ct. 1887, 155 L.Ed.2d 933 (2003).

**7.** 209 U.S. 123, 28 S.Ct. 441, 52 L.Ed. 714 (1908).

**8.** *See* AS 09.50.250 ("A person or corporation having a contract, quasi-contract or tort claim against the state may bring an action against the state....").

intent to preclude a remedy under § 1983," the court allowed the villages' suits based on the Indian Child Welfare Act to go forward against Cherian.

The superior court dismissed all of the villages' claims that arose out of the Multi-Ethnic Placement Act. Even though the statute creates mandatory duties in the state, the court found that because "the focus is system-wide and not individual," it does not have "the necessary rights-creating language" for it to be enforced under § 1983.

The court also determined that some of the villages' Adoption Act claims could go forward. It found that §§ 622(b)(10)(B)(ii), 626(3), 675(1)(B), 675(5)(A), and 675(5)(C) create enforceable rights. However, the court found that § 671(a)(19) does not create an enforceable right that the State give preference to a child's relatives when seeking to place him. It reasoned that because the language of that section is permissive and vague, it does not create a federal right and its "enforcement would strain judicial competence." The court therefore denied the state and its officials' motion to dismiss with regard to §§ 622(b)(10)(B)(ii), 626(3), 675(1)(B), 675(5)(A), and 675(5)(C) of the Adoption Act, but granted it with regard to § 671(a)(19).

### 5. Proper defendants under § 1983

The court next evaluated the claims based on the federal and state constitutions. Because "[t]he State is not a 'person' for purposes of § 1983," the court dismissed the claims against the state. But it allowed the claims against Cherian in his official capacity to go forward.

### 6. Plaintiffs' remedy

The superior court then turned its attention to the remedy the villages were seeking. The villages requested that the court appoint a panel of experts to oversee the implementation of a plan for reform and "to ensure that defendants protect the constitutional and statutory rights of the plaintiff tribes and their members." The court noted that in *Idaho v. Coeur d'Alene Tribe of Idaho*,[9] the Supreme Court determined that *Ex parte*

*Young*, which generally allows suits against state officials acting in their official capacities for prospective injunctive and declaratory relief, does not allow suits where "the suit would interfere with special sovereignty interests." The defendants argued that appointing a panel of experts to oversee the child welfare system interfered with special sovereignty interests.

The superior court determined that the sort of sovereignty interests at issue in *Coeur d'Alene* were not at issue here. In *Coeur d'Alene*, the Court "focused on the specific importance of tidelands . . . [as] representative of the state's sovereign rights." In contrast, it held that welfare programs do not implicate inviolate sovereign interests, since "[w]elfare programs receive funds from the federal government and must adhere to federal guidelines [and] [t]he state must be responsive to the federal government." Because the federal government is involved in state welfare programs, the superior court concluded that these programs are "not a unique sovereign right, but a collaboration between the state and federal governments."

### 7. Res judicata

Finally, the court addressed the state's argument that the doctrine of res judicata barred the villages' claims. It determined that because "the State fail[ed] to plead a specific example of a previous claim that would satisfy res judicata . . . the plaintiffs' claims are not barred."

### D. Defendants' Motion for Reconsideration

The defendants filed a motion for reconsideration expressing some confusion over which claims had been dismissed. The superior court clarified its holding as follows. The court dismissed the claims against the state that were based on the Indian Child Welfare Act, but allowed the villages to proceed on the Indian Child Welfare Act claims against Cherian. It dismissed the Adoption Act claim that was based on § 671(a)(19) with regard to all parties, but allowed the villages to proceed on the remaining Adop-

**9.** 521 U.S. 261, 117 S.Ct. 2028, 138 L.Ed.2d 438 (1997).

tion Act claims against the state, the agencies, and Cherian; the claims against Cherian could go forward under § 1983 and the claims against the state survived because the state, though not amenable to suit under § 1983, had waived its sovereign immunity by accepting funds under the Adoption Act. The court further dismissed all of the claims based on the Multi–Ethnic Placement Act and all of the claims based on state statutes. It also dismissed the constitutional claims as they pertained to the state, but allowed them to go forward against Cherian.

### E. The State's Petition

The state filed a petition for interlocutory review, which we granted. The state argues that the villages were not proper plaintiffs to bring claims under § 1983, that the state was immune from suit, that the Adoption Act does not create rights that are enforceable in actions based on § 1983, that the remedial provision of the Indian Child Welfare Act was the exclusive remedy available for violations of that act, and that the remedy sought by the villages—the appointment of a panel of experts to oversee the state's child welfare system—violates the state's special sovereignty interests.

## III. DISCUSSION

This petition requires us to resolve three related questions of federal law. First, we must determine whether the villages are permissible plaintiffs in this case. Second, we must determine who are the proper defendants in this case. Finally, we must deter-

mine whether the villages have stated a cause of action under § 1983: we must determine whether select provisions of the Adoption Act are enforceable under § 1983; in addition, we must determine whether the remedial provision of the Indian Child Welfare Act precludes the villages' reliance on § 1983.

### A. Standard of Review

■ We review a Rule 12(b)(6) dismissal de novo.[10] Motions to dismiss under Rule 12(b)(6) are viewed with disfavor[11] and, "unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief," the motion should be denied.[12] "In determining the sufficiency of the stated claim, it is enough that the complaint set forth allegations of fact consistent with some enforceable cause of action on any possible theory."[13]

### B. Are the Villages "Persons" Capable of Pursuing Claims Under § 1983?

#### 1. Can an Alaska Native Village ever be a "person" under § 1983?

42 U.S.C. § 1983 creates a cause of action for United States citizens and other persons under United States jurisdiction for violations of federal rights by persons acting under color of state law.[14] The villages have brought suit under § 1983 alleging that the state systematically violates provisions of the Adoption Act and the Indian Child Welfare Act. Some of the provisions that the state

**10.** *Guerrero v. Alaska Hous. Fin. Corp.,* 6 P.3d 250, 253 (Alaska 2000) (citing *Kollodge v. State,* 757 P.2d 1024, 1026 n. 4 (Alaska 1988)).

**11.** *Reed v. Municipality of Anchorage,* 741 P.2d 1181, 1184 (Alaska 1987) (citing *Knight v. American Guard & Alert, Inc.,* 714 P.2d 788, 791 (Alaska 1986)).

**12.** *Martin v. Mears,* 602 P.2d 421, 429 (Alaska 1979) (citing *Schaible v. Fairbanks Med. & Surgical Clinic, Inc.,* 531 P.2d 1252, 1257 (Alaska 1975)).

**13.** *Reed,* 741 P.2d at 1184 (citing *Linck v. Barokas & Martin,* 667 P.2d 171, 173 (Alaska 1983)).

**14.** 42 U.S.C. § 1983 provides in its entirety:

Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress, except that in any action brought against a judicial officer for an act or omission taken in such officer's judicial capacity, injunctive relief shall not be granted unless a declaratory decree was violated or declaratory relief was unavailable. For the purposes of this section, any Act of Congress applicable exclusively to the District of Columbia shall be considered to be a statute of the District of Columbia.

allegedly violates involve the state's direct obligations to the villages. For example, the villages allege that the state "systematically fails to provide the plaintiff [villages] with adequate notice about the removal of plaintiffs' children from their homes and about the transfer of children who are already in the State's custody." The villages bring these claims on their own behalf.

The villages bring other claims as *parens patriae* on behalf of their members. They allege that the state's placements of Native children fail to comply with the requirements of the Adoption Act and the Indian Child Welfare Act. For example, they allege that the state frequently transfers children between placements, fails to search for available relatives to care for the villages' children, and places the children in settings that do not comply with the Indian Child Welfare Act. These placements, the villages argue, harm the villages' children.

The state argues, relying on the United States Supreme Court's opinion in *Inyo County v. Paiute–Shoshone Indians*, that Alaska Native villages are not "persons" for purposes of § 1983 litigation and therefore may not bring suit under § 1983.

*Inyo County* stemmed from "a California county's investigation of Native American tribe members" for alleged welfare fraud.[15] The tribe members being investigated were employees of the tribe's casino, which was wholly owned by the tribe.[16] In their applications for state welfare benefits, these employees failed to report alleged casino earnings.[17] After seeking and failing to get the tribe to provide the employment records, the county executed a search warrant on tribal property and seized the records.[18] Some months later, the county sought employment records of additional employees.[19] In this instance, the tribe indicated that it would release the records voluntarily. But because its privacy policy prohibited the release of employment records without an employee's consent, the tribe asked the county to provide redacted copies of the last page of the employees' welfare applications which informed applicants that their employment records were subject to review by county officials.[20] When the district attorney refused to provide the redacted pages, the tribe, anticipating another search warrant, filed suit in federal district court against the county and various county officials.[21] The tribe sought injunctive and declaratory relief and damages under § 1983, alleging that the county had violated and would continue to violate the tribe's right to self-government.[22]

Before determining whether the county had the authority to execute the search, the Supreme Court addressed the question whether "a tribe qualifies *as a claimant*—a 'person within the jurisdiction' of the United States—under § 1983."[23] The Court determined that it did not.[24] The Court first noted the county's claim that there is a "longstanding interpretive presumption that 'person' does not include the sovereign."[25] The Court rejected this argument. It noted that in other contexts it has recognized the "qualification of a sovereign as a 'person' who may maintain a particular claim for relief."[26] And it indicated that the presumption that "identical words used in different parts of the same act . . . have the same meaning" was "not rigid" and that "the meaning of the same words well may vary to meet the purposes of the law."[27]

The Court next considered the tribe's argument that § 1983 should be broadly con-

**15.** *Inyo County*, 538 U.S. at 704, 123 S.Ct. 1887.

**16.** *Id.*

**17.** *Id.* at 704–05, 123 S.Ct. 1887.

**18.** *Id.* at 705, 123 S.Ct. 1887.

**19.** *Id.*

**20.** *Id.* at 706, 123 S.Ct. 1887.

**21.** *Id.*

**22.** *Id.*

**23.** *Id.* at 709, 123 S.Ct. 1887.

**24.** *Id.* at 712, 123 S.Ct. 1887.

**25.** *Id.* at 709, 123 S.Ct. 1887.

**26.** *Id.* at 711, 123 S.Ct. 1887.

**27.** *Id.*

strued. The tribe argued that "Congress intended § 1983 to provide a powerful civil remedy against all forms of official violation of federally protected rights." [28] Given the particular vulnerability of Indian tribes to "infringement of their federally protected rights by states," [29] the tribe maintained that § 1983 should be understood to encompass tribal claims that a state had infringed a tribe's sovereign immunity. The Court was not persuaded. The Court observed that "[s]ection 1983 was designed to secure private rights against government encroachment." [30] And it reasoned that a private person "would have no right to immunity from an appropriately executed search warrant based on probable cause." [31] The Court emphasized that the purpose of § 1983 was not "to advance a sovereign's prerogative to withhold evidence relevant to a criminal investigation." [32] The Court therefore concluded that "the Tribe may not sue under § 1983 to vindicate the sovereign right it here claims." [33]

The state argues that the import of *Inyo County* is that tribes—and by extension Alaska Native Villages [34]—may not sue under § 1983 to vindicate sovereign rights and that all of the claims asserted by the villages are "sovereign based." The villages argue in response that *Inyo County* merely prohibited tribes from suing to vindicate sovereign rights, and does not prevent them from bringing *parens patriae* claims on behalf of their members.

We agree with the villages. We find it significant that the Court did not credit the government's argument that the mere presence of the word "person" excludes sovereigns.[35] In addition, we note that the Court appears to have carefully limited its holding: the Court specified that "*in the situation here presented*, the Tribe does not qualify as a 'person' who may sue under § 1983"; [36] and the Court ruled that "the Tribe may not sue under § 1983 *to vindicate the sovereign right it here claims*." [37] This language strongly suggests that the Court intended to leave open the possibility that villages might under the proper circumstances be able to bring suit under § 1983. And it suggests that the relevant criterion for determining whether the villages may proceed is the nature of the right the villages seek to vindicate.

The state argues against adopting this reading of *Inyo County*, pointing to Justice Stevens's concurring opinion. Justice Stevens agreed that the tribe lacked a claim. But he reached this conclusion not because he thought that the tribe in that case failed to qualify as a person under § 1983–the majority's view-but rather because "the county's alleged infringement of the Tribe's sovereign prerogatives did not deprive the Tribe of 'rights, privileges, or immunities secured by the Constitution and laws' within the meaning of § 1983." [38] The state reads this concurrence as being based on the premise that the Court's opinion held that tribes could never be persons under § 1983. Relying on Justice Stevens's understanding of the Court's holding, the state insists that any narrower reading of *Inyo County* would be untenable.

But it seems questionable whether Justice Stevens's concurrence necessarily reflects the sweeping view of the Court's opinion attributed to him by the state. And in any event, Justice Stevens's individual concurrence hardly qualifies as a definitive interpretation of what the Court actually meant to hold. Given the Court's outright rejection of the position of the government in *Inyo Coun-*

28. *Id.* at 710, 123 S.Ct. 1887 (citations omitted).

29. *Id.*

30. *Id.* at 712, 123 S.Ct. 1887.

31. *Id.*

32. *Id.*

33. *Id.*

34. *John v. Baker*, 982 P.2d 738, 750 (Alaska 1999).

35. *Inyo County*, 538 U.S. at 711, 123 S.Ct. 1887.

36. *Id.* at 704, 123 S.Ct. 1887 (emphasis added).

37. *Id.* at 712, 123 S.Ct. 1887 (emphasis added).

38. *Id.* at 713, 123 S.Ct. 1887 (Stevens, J., concurring in judgment).

*ty* and the Court's careful qualification of its holding, we think the better reading is that *Inyo County* simply precludes tribes from using § 1983 to vindicate their own *sovereign* rights. We do not think it stands for the proposition that tribes may never be "persons" for purposes of asserting claims under § 1983.[39]

Because we conclude that *Inyo County* leaves open the possibility that tribes may bring § 1983 claims in some circumstances, we must determine whether, under the circumstances of the present case, the villages may press their claims. The villages assert two sorts of claims. First, the villages bring claims as *parens patriae* on behalf of their members, alleging that violations of the rights of their members harm the villages as a whole. Second, the villages bring claims on their own behalf, alleging, for example, that the failure to notify the villages when taking member children into state custody violates the direct rights of the villages as secured by the Indian Child Welfare Act.

### 2. Are the villages here asserting their *parens patriae* claims as persons?

▆▆ The doctrine of *parens patriae* allows a state to bring suit to protect its interests in matters of public concern.[40] In order to determine which claims qualify as *parens patriae* claims, the Supreme Court has distinguished between sovereign, non-sovereign, and quasi-sovereign interests; *parens patriae* claims may only be brought to vindicate quasi-sovereign interests.[41]

▆▆ Sovereign interests include "the exercise of sovereign power over individuals and entities within the relevant jurisdiction," as well as "the demand for recognition from other sovereigns."[42] This is the sort of interest that was at issue in *Inyo County*. Non-sovereign interests include a state's proprietary interests as well as the interests a state protects when, acting as "no more than a nominal party," it seeks to protect the interests of private parties in court.[43]

▆▆ Quasi-sovereign interests, which a state may protect in court through the mechanism of *parens patriae* actions, are those interests "that the State has in the well-being of its populace."[44] In a *parens patriae* action, a state may not simply aggregate the claims of its citizens.[45] Rather, the state must be able to articulate an injury to the well-being of the state as a whole or to a sufficiently large segment of its population, and the overall injury must be more than the mere sum of its parts.[46] Although in theory this requirement poses a limitation on *parens patriae* suits, in practice, the courts have generally found a sufficient interest to exist where the aggregation of individual interests creates even non-quantifiable effects upon segments of the population.[47] Further, the

---

**39.** We note that the scholars who have expressly considered the issue appear to agree. *See* David L. Shapiro, *Justice Ginsburg's First Decade: Some Thoughts About Her Contributions in the Fields of Procedure and Jurisdiction*, 104 COLUM. L.REV. 21, 29 (2004) (arguing that tribes should qualify as persons); Robert Travis Willingham, *Inyo County, California v. Paiute-Shoshone Indians of the Bishop Community of the Bishop Colony and § 1983 Actions by Indian Tribes*, 72 UMKCL. REV. 765, 784 (2004); Robert H. Freilich et al., *The Freilich Report: A Review of the 2002–03 U.S. Supreme Court Decisions During an Era of Domestic Insecurity*, 35 URB. LAW. 565, 628 n. 515 (2003).

**40.** *Georgia v. Pa. R. Co.*, 324 U.S. 439, 449–51, 65 S.Ct. 716, 89 L.Ed. 1051 (1945).

**41.** *Alfred L. Snapp & Son, Inc. v. Puerto Rico*, 458 U.S. 592, 600–02, 102 S.Ct. 3260, 73 L.Ed.2d 995 (1982).

**42.** *Id.* at 601, 102 S.Ct. 3260.

**43.** *Id.* at 601–02, 102 S.Ct. 3260; *see also Pa. R. Co.*, 324 U.S. at 447, 65 S.Ct. 716 (noting that a state may "sue[ ] as a proprietor to redress wrongs suffered by it as the owner of a railroad and as the owner and operator of various public institutions").

**44.** *Snapp*, 458 U.S. at 602, 102 S.Ct. 3260.

**45.** *Id.* at 607, 102 S.Ct. 3260.

**46.** *Id.*

**47.** *See, e.g., People v. Peter & John's Pump House, Inc.*, 914 F.Supp. 809, 813 (N.D.N.Y.1996) (noting that "the relief sought in discrimination lawsuits often carries greater implications and a 'broader scope' than the denial of benefits, services, or accommodation to known individuals"). *But see Prince George's County v. Levi*, 79 F.R.D. 1, 4 (D.C.Md.1977) (concluding that a county lacked standing to bring a *parens patriae* claim to

fact that individual parties could have brought suit to vindicate their rights does not deprive a state of *parens patriae* standing.[48] Similarly, the fact that a statute creates a private right of action of individuals does not preclude a sovereign's ability to bring a *parens patriae* claim.[49] In such actions, the state merely asserts that in addition to harming its citizens individually, the offending party has harmed the overall interests of the state. For example, the Third Circuit has held that because the state generally has a broad interest in protecting its citizens from civil rights violations, a state may bring an action in *parens patriae* to enforce civil rights statutes, even though private individuals would have had a cause of action under the same statutes.[50] Because the state's interests will usually not be completely addressed by individual lawsuits brought by aggrieved individuals, courts have allowed the state to sue as *parens patriae*.[51]

The state argues that by definition only sovereigns may assert *parens patriae* claims. It therefore concludes that *Inyo County* bars such claims:

> The Villages cannot have it both ways. If these are individual claims then individuals must bring them, not the Villages acting in *parens patriae*. If these are quasi-sovereign claims, then the Native Villages are

not "persons" that can bring a section 1983 action.

The state has misunderstood the nature of *parens patriae* claims. While it is true that the sovereign must articulate an interest that is more than the mere aggregate of the individual claims, and while it is true that only sovereigns may bring *parens patriae* claims, the injury the sovereign seeks to remedy is not to its sovereignty, but rather to its larger population.

We think this injury is remediable under § 1983, even where the plaintiff is a sovereign. In *Inyo County*, the Court held that § 1983 was not designed to "advance a sovereign's prerogative to withhold evidence" where the sovereign claimed immunity from "an appropriately executed search warrant based on probable cause."[52] Rather, the Court held, "Section 1983 was designed to secure private rights against government encroachment."[53] We think that the injury a population suffers when the rights of some of its members are systematically violated falls within the sorts of injuries that § 1983 was enacted to remedy. We therefore think that the logic of *parens patriae* claims supports a ruling that villages may sue as *parens patriae* under § 1983.

This conclusion is borne out by the case law. Although the courts are divided over

protect the rights of African American citizens since there was "no indication why those blacks [were] helpless to challenge denial of their rights or how the [county] is affected by that denial in a way that is separate and distinct").

**48.** See *Peter & John's Pump House*, 914 F.Supp. at 813.

**49.** In *Georgia v. Pennsylvania R. Co.*, the Court allowed Georgia to bring suit as *parens patriae* under the Clayton Act which, the Court noted, also allowed for individual suits by private parties. 324 U.S. at 447, 65 S.Ct. 716. In *Georgia v. Tennessee Copper Co.*, the Court allowed Georgia to sue a private company seeking "to enjoin the defendant copper companies from discharging noxious gas from their works in Tennessee." 206 U.S. 230, 236, 27 S.Ct. 618, 51 L.Ed. 1038 (1907). Although the Court indicated that it might hesitate to allow private parties to seek an injunction (due to the extreme economic consequences of such an injunction), it did indicate that the private injured parties likely had a remedy at law. *Id.* at 238, 27 S.Ct. 618. In *Snapp v. Puerto Rico*, the commonwealth of Puerto Rico

brought suit against private employers to enforce the provisions of the Wagner–Peyser Act and the Immigration and Nationality Act. 458 U.S. 592, 608, 102 S.Ct. 3260, 73 L.Ed.2d 995 (1982). The circuits are split about whether these acts allow private rights of action. *Compare Gomez v. Florida State Employment Serv.*, 417 F.2d 569, 575–76 (5th Cir.1969) (finding that the Wagner–Peyser Act created a private right of action) *with Donaldson v. United States Dep't of Labor*, 930 F.2d 339, 342 (4th Cir.1991) (noting that whether the Wagner–Peyser Act allows a private right of action is questionable), *and Garrison v. OCK Const., Ltd.*, 864 F.Supp. 134, 135 (D.Guam) (noting split of authority regarding whether INA creates private cause of action).

**50.** *Pennsylvania v. Porter*, 659 F.2d 306 (3d Cir. 1981).

**51.** *Id.* at 315–16.

**52.** *Inyo County*, 538 U.S. at 712, 123 S.Ct. 1887.

**53.** *Id.*

whether sovereigns may bring non-*parens patriae* claims in their own right under § 1983,[54] where sovereigns have pressed § 1983 claims using the doctrine of *parens patriae,* several courts have allowed those claims to go forward. For example, in *Support Ministries for Persons with Aids, Inc. v. Village of Waterford,* the District Court allowed the state of New York to bring suit as *parens patriae* under § 1983 to redress discrimination encountered by persons with AIDS.[55] Similarly, in *Pennsylvania v. Glickman,* the court permitted the state to sue as *parens patriae* under § 1983 to remedy racial discrimination in the hiring of firefighters.[56] And in *Pennsylvania v. Flaherty,* the court allowed Pennsylvania to bring suit as *parens patriae* to remedy civil rights deprivations, finding jurisdiction under 28 U.S.C. § 1343, the jurisdictional counterpart of § 1983.[57]

Finally, in *Pennsylvania v. Porter,* the state of Pennsylvania sued a Pennsylvania borough, the mayor of the borough, the police chief, a police officer, and various other borough officials.[58] The state alleged that the police officer,

with the instigation, acquiescence and ratification of the Mayor and Council, engaged in an extended pattern or practice of conduct denying persons lawfully in [the Borough] their constitutional rights to be free from physical violence, mistreatment, threats, harassment, illegal determination, illegal arrests, and illegal searches and seizures.[59]

The state brought suit as *parens patriae* under § 1983.[60] The borough argued that the state was not a proper plaintiff under § 1983 or under 28 U.S.C. § 1343, the jurisdictional counterpart to § 1983.[61] The Third Circuit determined that where a state sues as *parens patriae* to remedy civil rights violations,

[t]he question is not whether either the fourteenth amendment or section 1983 protects the Commonwealth—neither does—but whether the Commonwealth is an appropriate plaintiff in an action seeking to prevent the infliction of constitutional violations on the persons the amendment and the statute do protect.[62]

After noting multiple reasons that the state "should not be forced to rely upon the hap-

54. Foreign sovereigns may not bring suit under § 1983. *Breard v. Greene,* 523 U.S. 371, 378, 118 S.Ct. 1352, 140 L.Ed.2d 529 (1998). And the Third Circuit has held that the United States is not a proper civil plaintiff under 18 U.S.C. §§ 241 and 242 which are the criminal counterparts to §§ 1983 and 1985. *United States v. City of Philadelphia,* 644 F.2d 187, 192–203 (3d Cir.1981). But the Eleventh Circuit has allowed the United States to bring suit under § 1983. *United States v. Alabama,* 791 F.2d 1450, 1455 (11th Cir.1986) (declining to allow a state university to intervene in a § 1983 action brought by the United States against Alabama on the grounds that states could not sue themselves, but not objecting to the status of the United States as plaintiff under § 1983). Some courts have held that states and municipalities are not proper plaintiffs under § 1983. *Rockford Bd. of Educ. v. Ill. State Bd. of Educ.,* 150 F.3d 686, 688 (7th Cir.1998) (municipalities are not proper plaintiffs under § 1983); *Illinois v. City of Chicago,* 137 F.3d 474, 477 (7th Cir.1998) ("[A] state is not a 'person' under [§ 1983] and therefore can be neither plaintiff nor defendant in a § 1983 case.") (citations omitted); *City of Safety Harbor v. Birchfield,* 529 F.2d 1251, 1255 (5th Cir.1976) (holding, based on a now-overruled Supreme Court holding that municipalities could not be sued under § 1983, that municipalities could similarly not be plaintiffs under § 1983). But others have

concluded that states and their subdivisions may bring claims under § 1983. *South Macomb Disposal Auth. v. Township of Washington,* 790 F.2d 500, 503 (6th Cir.1986) (holding that because municipalities could be defendants under § 1983 it would be anomalous to find that they were precluded from being plaintiffs).

55. 799 F.Supp. 272 (N.D.N.Y.1992).

56. 370 F.Supp. 724 (W.D.Pa.1974).

57. 404 F.Supp. 1022 (W.D.Pa.1975), *vacated,* 760 F.Supp. 472 (W.D.Pa.1991) (vacating the earlier decision not because the state was an improper plaintiff but because the standards for showing unconstitutional discrimination had changed in the intervening years and the injunction issued by the original court was therefore no longer valid).

58. 659 F.2d 306 (3d Cir.1981).

59. *Id.* at 309.

60. *Id.* at 314.

61. *Id.*

62. *Id.* at 314.

penstance of suits by individual victims of constitutional violations," [63] the court concluded that

> the Commonwealth is in this suit advancing significant sovereign interests of its own in the prevention of future violations of constitutional rights of its citizens, in circumstances in which it cannot reasonably anticipate that private enforcement will achieve the protection of those sovereign interests. Any description of a *parens patriae* remedy, even the narrowest, includes the state of facts alleged in the Commonwealth's complaint.[64]

The court therefore concluded that Pennsylvania was a proper plaintiff to vindicate the rights § 1983 was designed to protect.

We find the reasoning of the Third Circuit to be persuasive. In the present case, the villages bring suit as *parens patriae* to prevent future violations of the Adoption Act and the Indian Child Welfare Act. The provisions they seek to enforce as *parens patriae* affect the well-being of the villages' families and children. As the superior court concluded, the well-being of individual families and children is inextricably bound up with the villages' ability to maintain their integrity, which is "something that can only occur through the children of the Village." Under these circumstances, if the Adoption Act and the Indian Child Welfare Act are otherwise enforceable under § 1983 then the villages may, as *parens patriae*, bring suit to enforce those statutes.

### 3. Are the villages acting as persons in asserting their direct § 1983 claims?

■ Whether *Inyo County* precludes the villages from suing under § 1983 to vindicate rights claimed by the villages *as villages* is a closer question. The superior court did not

expressly consider this issue, but it appears to have allowed the villages to go forward with the claims they press on their own behalf. The state argues that the tribal notification provisions apply to the villages in their sovereign status and that claims alleging their violation are therefore foreclosed by *Inyo County*.

We find the state's argument to be persuasive. As the state maintains, the notification provisions of the Indian Child Welfare Act were enacted to protect tribes' sovereign rights to exercise jurisdiction over and to participate in decisions concerning the welfare of their children—whether their children need to be removed from their natural parents, whether they need to be placed in foster homes, and whether their ties to their parents need to be severed.[65] The villages' right to participate in deciding such issues is the right of a sovereign. Under the reasoning of *Inyo County* these rights may not be enforced by villages under § 1983.[66] *Inyo County* requires us to conclude that the villages may not bring these claims on their own behalf under § 1983.

### C. Are the Villages' Claims Properly Brought Against These Defendants?

### 1. Section 1983 does not authorize suits against states.

■ The superior court observed that "States have sovereign immunity in their own courts," and that "Congress does not have the power to subject non-consenting states to private suits in state court." But the superior court reasoned that if the state of Alaska had waived its sovereign immunity for any of the villages' claims, the state would be a proper defendant. The superior court noted that AS 09.50.250 waives the state's sovereign immunity for contract claims. The

**63.** *Id.* at 315.

**64.** *Id.* at 316.

**65.** *Cf.* 25 U.S.C. § 1902 (2005):
The Congress hereby declares that it is the policy of this Nation to protect the best interests of Indian children and to promote the stability and security of Indian tribes and families by the establishment of minimum Federal standards for the removal of Indian children

from their families and the placement of such children in foster or adoptive homes which will reflect the unique values of Indian culture, and by providing for assistance to Indian tribes in the operation of child and family service programs.

**66.** *See Inyo County*, 538 U.S. at 712, 123 S.Ct. 1887.

court observed that the state of Alaska entered into a contract pursuant to the Adoption Act. And it reasoned that third-party beneficiaries of that contract could sue the state to enforce that contract.

But under our understanding of the Supreme Court's approach to § 1983, the state's waiver of sovereign immunity—even if it would apply in the present case, a question which we decline to decide—does not control the outcome in this case. The Supreme Court has unequivocally held that states are not proper defendants under § 1983.[67] The reason that "§ 1983 actions do not lie against a State" is not sovereign immunity, which, as the Court has noted, can be waived.[68] Rather, "§ 1983 creates no remedy against a State" regardless of any purported waiver of sovereign immunity.[69] Because the Court has determined that Congress did not intend § 1983 to create a remedy against states,[70] the state's alleged waiver of sovereign immunity is, simply put, irrelevant. The villages therefore may not bring suit under § 1983 against the state to enforce any rights that the Adoption Act and the Indian Child Welfare Act may create.

■ We note that the superior court appears to have concluded that although the villages could not bring suit under § 1983 to enforce the Adoption Act, the state's waiver of sovereign immunity in AS 09.50.250. creates a cause of action against the state for contract violations and the suit could therefore go forward under AS 09.50.250. But the superior court has confused two distinct requirements for suing the state. It is true that, in order for a party to sue a state, the party must be able to point to a waiver of sovereign immunity. But a bare waiver of sovereign immunity is not sufficient. The party may only proceed if there is also a cause of action. Although AS 09.50.250 provides the requisite waiver of sovereign immunity, it creates no cause of action. A party wishing to take advantage of the state's waiver of sovereign immunity must be able to rely on an independent cause of action. Normally parties who sue the state for breach of contract rely upon state common and statutory law as the bases for their claims. But in the present case, the villages have relied solely upon the cause of action created by § 1983. This cause of action will not support a claim against the state, regardless of whether the state has waived its sovereign immunity. For purpose of deciding the present petition, we need not consider whether the villages might be able to plead an ordinary contract claim against the state for violating the Adoption Act; the villages neither pled nor briefed such a cause of action and, given the complicated intersection between federal statutory and state common law that such a claim would involve, we decline to consider it in a vacuum.

2. **The villages may sue Tom Cherian in his official capacity for prospective injunctive and declaratory relief.**

■ Although § 1983 does not create a cause of action directly against states, it expressly creates a cause of action against persons who violate federal law under color of state law. The villages named not only the state and the division as defendants in this action; they also named defendant Tom Cherian in his capacity as the division's acting director. Because § 1983 creates a cause of action against state officials acting under color of state law, the villages' claims may proceed as to Cherian, provided that Cherian is not protected by sovereign immunity.

**67.** *Arizonans for Official English v. Arizona,* 520 U.S. 43, 69, 117 S.Ct. 1055, 137 L.Ed.2d 170 (1997). Recently in *ASW v. Oregon,* the Ninth Circuit permitted a § 1983 claim to enforce rights under the Adoption Act to proceed against the state and the director of the Oregon Department of Human Services. 424 F.3d 970 (9th Cir.2005). For the purposes of the appeal, the court appeared to assume arguendo that the state was vulnerable to a § 1983 action. However, the court did not decide the issue and the state did not raise it, focusing its argument instead on the contention that the appeal was moot. *Id.* at 973.

**68.** *Arizonans for Official English,* 520 U.S. at 69, 117 S.Ct. 1055.

**69.** *Id.; see also Will v. Mich. Dep't of State Police,* 491 U.S. 58, 65–66, 109 S.Ct. 2304, 105 L.Ed.2d 45 (1989).

**70.** *Will,* 491 U.S. at 65–66, 109 S.Ct. 2304.

States generally possess sovereign immunity from suit and may not be sued absent a waiver of sovereign immunity.[71] Ordinarily, the Supreme Court has held, suing state officials in their official capacities for damages amounts to the same thing as suing states directly; such suits are therefore normally barred by a state's sovereign immunity.[72] But in actions filed under § 1983, the Court has recognized, under the doctrine it first established in *Ex parte Young*, that state officials acting in their official capacity may be sued for violations of federal statutory or constitutional rights when the claims against them seek only prospective declaratory or injunctive relief.[73] Because, under *Ex parte Young*, a state officer who violates federal law or the federal constitution is presumed to be acting without the authority of the state, such suits are simply deemed not to be suits against the state, so they do not implicate a state's sovereign immunity.[74]

■ As a result, even if a state has declined to waive its sovereign immunity, a party injured by the actions of a state official is not without remedy. The party may seek to enjoin the actions of the state official or may seek a court declaration that the acts violate federal law or the United States Constitution. And as a practical matter, either remedy—a declaratory judgment or an injunction directed against the official—is functionally the same as an injunction prohibiting the state itself from doing those acts.

The villages here do not seek damages in the present case. Rather, they seek injunctive and declaratory relief. Their claims against Cherian in his official capacity are therefore authorized by § 1983 and are not prohibited by sovereign immunity. They may therefore go forward.

## D. Do the Villages Assert Violations of Rights Enforceable Under § 1983?

■ Having established that the villages are proper plaintiffs to bring their *parens patriae* claims and that Cherian is the proper defendant in this action, we must next consider whether the villages have stated a cause of action under § 1983. 42 U.S.C. § 1983 provides in relevant part:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress[.] [75]

Where a plaintiff shows that a statute creates an enforceable right, there is a "rebuttable presumption that the right is enforceable under § 1983." [76] If the rights-creating statute forecloses an action under § 1983, either expressly or by implication, the plaintiff's claim is barred.[77]

---

71. *See, e.g., State v. Zia, Inc.*, 556 P.2d 1257, 1260 (Alaska 1976).

72. *Arizonans for Official English*, 520 U.S. at 69 n. 24, 117 S.Ct. 1055; *see also Edelman v. Jordan*, 415 U.S. 651, 663, 678, 94 S.Ct. 1347, 39 L.Ed.2d 662 (1974).

73. *Ex parte Young*, 209 U.S. 123, 28 S.Ct. 441, 52 L.Ed. 714 (1908) (holding that state officials may be sued for injunctive relief notwithstanding the Eleventh Amendment's prohibition of suits against states by citizens in federal court); *Edelman*, 415 U.S. at 677, 94 S.Ct. 1347 (affirming that in *Ex parte Young* suits, plaintiffs may seek only prospective injunctive relief); *Alden v. Maine*, 527 U.S. 706, 747–48, 119 S.Ct. 2240, 144 L.Ed.2d 636 (1999) (noting that *Ex parte Young* suits may be brought in state as well as federal court).

74. *See Ex parte Young*, 209 U.S. at 159, 28 S.Ct. 441 (indicating that a state official's "use of the name of the state to enforce an unconstitutional act to the injury of complainants is a proceeding without the authority of, and one which does not affect, the state in its sovereign or governmental capacity").

75. The full text of 42 U.S.C. § 1983 is set out in note 14, above.

76. *Blessing v. Freestone*, 520 U.S. 329, 341, 117 S.Ct. 1353, 137 L.Ed.2d 569 (1997).

77. *City of Rancho Palos Verdes v. Abrams*, 544 U.S. 113, 122, 125 S.Ct. 1453, 161 L.Ed.2d 316 (2005).

In order to bring suit under § 1983, a plaintiff must show the existence of "an unambiguously conferred right" that is protected by federal laws or the United States Constitution.[78] In other words, "a plaintiff must assert the violation of a federal *right*, not merely a violation of federal *law*."[79] In *Blessing v. Freestone*, the Supreme Court set out a three-part test for determining whether this showing had been made:

> First, Congress must have intended that the provision in question benefit the plaintiff. Second, the plaintiff must demonstrate that the right assertedly protected by the statute is not so 'vague and amorphous' that its enforcement would strain judicial competence. Third, the statute must unambiguously impose a binding obligation on the States. In other words, the provision giving rise to the asserted right must be couched in mandatory, rather than precatory, terms.[80]

More recently, in *Gonzaga University v. Doe*, the Court noted that there had been some confusion over the *Blessing* test and that some courts had misunderstood *Blessing* "as allowing plaintiffs to enforce a statute under § 1983 so long as the plaintiff falls within the general zone of interest that the statute is intended to protect."[81] To rectify this misunderstanding, the Court has clarified: § 1983 may only be used where Congress intended that the substantive statute at issue actually confer *rights* on the plaintiff. Merely conferring "broader or vaguer 'bene-

fits' or 'interests'" does not render a statute enforceable under § 1983.[82]

The state argues here that the superior court erred when it found that §§ 675(1)(B), 675(5)(A), and 675(5)(C) of the Adoption Act create enforceable rights. And it argues that the remedial provisions of the Indian Child Welfare Act foreclose an action under § 1983.[83] We address these arguments in turn.

### 1. The Adoption Act claims

In 1980 Congress passed the Adoption Assistance and Child Welfare Act (Adoption Act).[84] The Act provides federal funds to assist states "in the conduct of their child welfare services,"[85] and "to encourage permanent homes for children, either with their own or adoptive parents."[86] In order to receive funds under these acts, states "must submit a plan to the Secretary of Health and Human Services for approval by the Secretary."[87] The plan must include a number of elements.[88]

### a. Adoption Act generally

The villages claim that "Congress passed a statute specifically designed to protect the rights of beneficiaries [of the Adoption Act] to enforce 'the required contents of a State plan.'" To support this claim, the villages point to a recently adopted provision of the Act, 42 U.S.C. § 1320a–2. But their reading of this provision as a rights-creating directive is too strong.

**78.** *Gonzaga Univ. v. Doe*, 536 U.S. 273, 283, 122 S.Ct. 2268, 153 L.Ed.2d 309 (2002).

**79.** *Blessing*, 520 U.S. at 340, 117 S.Ct. 1353 (emphasis in original).

**80.** *Id.* at 340–41, 117 S.Ct. 1353 (citations omitted).

**81.** *Gonzaga Univ.*, 536 U.S. at 283, 122 S.Ct. 2268.

**82.** *Id.*

**83.** The state does not dispute that the Indian Child Welfare Act creates specific enforceable rights meant to benefit Indian families and tribes. Nor does the state argue that the Adoption Act specifically forecloses a remedy under

§ 1983. We therefore find no need to discuss these points.

**84.** Pub.L. No. 96–272, 94 Stat. 500, 502 (1980) (codified as amended at 42 U.S.C. §§ 620–628 & §§ 670–679).

**85.** G.M. Buechlein, Annotation, *Actions Under 42 U.S.C.A. § 1983 for Violations of Adoption Assistance and Child Welfare Act* (42 U.S.C.A. § 620 et seq. and 670 et seq.), 93 A.L.R. Fed. 314, § 2 (1989).

**86.** *Id.*

**87.** *Suter v. Artist M.*, 503 U.S. 347, 351, 112 S.Ct. 1360, 118 L.Ed.2d 1 (1992).

**88.** *See* 42 U.S.C. § 671 (2005).

In *Suter v. Artist M.*, the Supreme Court held that 42 U.S.C. § 671(a)(15), a provision not at issue in the present case, did not create rights that were enforceable under § 1983.[89] The Court's opinion included language broadly suggesting that no spending clause statute could create rights enforceable by third-party beneficiaries if the statute was written so that the receipt of federal funds appeared to be conditioned only upon the approval of a plan by the Secretary of Health and Human Services.[90] The effect of this holding threatened to preclude private enforcement of virtually all provisions included in legislation that required states to submit plans that met federal specifications. In response, Congress enacted 42 U.S.C. § 1320a–2 which provides:

> In an action brought to enforce a provision of this chapter, such provision is not to be deemed unenforceable because of its inclusion in a section of this chapter requiring a State plan or specifying the required contents of a State plan. This section is not intended to limit or expand the grounds for determining the availability of private actions to enforce State plan requirements other than by overturning any such grounds applied in *Suter v. Artist M.*, [503 U.S. 347,] 112 S.Ct. 1360[, 118 L.Ed.2d 1] (1992), but not applied in prior Supreme Court decisions respecting such enforceability; provided, however, that this section is not intended to alter the holding in *Suter v. Artist M.* that section 671(a)(15) of this title is not enforceable in a private right of action.

The language of this provision, as well as subsequent interpretations of it, makes it clear that the statute did not make all the provisions of Title 42—the section of the U.S.Code that requires a number of state plans—enforceable privately. Rather, it merely "foreclose[d] the refusal to find a federal right enforceable under § 1983 because the statutory provision may be included in a section requiring a State plan or specifying the required contents of such a plan."[91] In other words, § 1320a–2 returned the law to the status quo ante; after § 1320a–2, just as before *Suter*, a plaintiff seeking to enforce a provision of spending clause legislation must show that "the provision at issue unambiguously confers a private right enforceable pursuant to § 1983 under the *Blessing* framework."[92]

Because § 1320a–2 does not resolve this issue, we must consider whether the provisions the villages rely upon— §§ 675(1)(B), 675(5)(A), and 675(5)(C)—create rights that may be enforced under § 1983.

### b. Adoption Act § 675(1)(B)

▮▮▮ Section 671(a)(16) establishes that to qualify for approval, a state plan must provide "for the development of a case plan . . . for each child receiving foster care maintenance payments under the State plan."[93] Section 675(1)(B) provides that the required case plan must include, "[a] plan for assuring that the child receives safe and proper care and . . . [must] address the needs of the child while in foster care."[94] These provisions, read in conjunction, create an enforceable right to a state plan that provides for the development of individual case plans.[95]

> (B) A plan for assuring that the child receives safe and proper care and that services are provided to the parents, child, and foster parents in order to improve the conditions in the parents' home, facilitate return of the child to his own safe home or the permanent placement of the child, and address the needs of the child while in foster care, including a discussion of the appropriateness of the services that have been provided to the child under the plan.

**89.** *Suter*, 503 U.S. at 350, 112 S.Ct. 1360.

**90.** *See id.* at 358, 112 S.Ct. 1360.

**91.** *Charlie H. v. Whitman*, 83 F.Supp.2d 476, 484 (D.N.J.2000).

**92.** *Id.*

**93.** 42 U.S.C. § 671(a)(16) (2005).

**94.** In full, § 675(1)(B) provides:
As used in this part or part B of this subchapter:
(1) The term "case plan" means a written document which includes at least the following:
. . . .

**95.** The state argues that because § 675 is definitional, it cannot create rights. Because we read § 675 in conjunction with other sections of the Adoption Act, we need not consider whether or under what circumstances definitional provi-

The requirement that the state must have a plan to develop individual case plans satisfies the *Blessing/Gonzaga* test. First, it was clearly designed to benefit individual children in foster care: the case-plan requirement is directed at individual children, and each child receiving foster care payments is entitled to a case plan. The state-plan requirement ensures that each child will receive a case plan. Second, the right to a state plan is not vague or amorphous. Either a state has a plan or it does not; this right is not too imprecise to be enforceable. Finally, § 671(a)(16) is unambiguously mandatory. The title of § 671(a) is "Requisite features of State plan." "Requisite" is defined by *Webster's Third New International Dictionary* as, "required ... indispensable." [96] The introductory language is also clearly mandatory. It provides that "[i]n order for a State to be eligible for payments under this part, it *shall* have a plan approved by the Secretary which ... (16) provides for the development of a case plan." [97] The definition of "case plan" is equally mandatory. Section 675(1) states that "[t]he term 'case plan' means a written document which includes at least the following ... (B) A plan for assuring ... that services are provided to the parents, child, and foster parents in order to ... address the needs of the child." Because § 675(1)(B), read in conjunction with § 671(a)(16), meets the requirements of the *Blessing/Gonzaga* test, we hold that those sections create an enforceable right to have a case plan. Under § 675(1)(B), the plan must include assurances that the child "receives safe and proper care," that "services are provided to the parents, child, and foster parents in order to improve the conditions in the parents' home," and that it "address the needs of the child while in foster care." [98]

Although we conclude that §§ 671(a)(16) and 675(1)(B) create an enforceable right to a state plan that provides for the development of individual case plans addressing the topics spelled out in § 675(1)(B), we do not read these provisions as guaranteeing that an individual case plan meeting all requisite elements will actually be provided in any particular case. As we read these provisions, the enforceable right they create is systematic: it ensures that the state will develop, adopt, and enforce a statewide system designed to provide each family and child with a case plan that meets the statute's specifications; but it does not give all parents and children a case-by-case guarantee of a satisfactory plan. In other words, the Act allows the villages to sue to ensure that the state adopts and enforces a plan that realistically strives to provide all children and families with compliant plans; but it does not allow claims simply alleging that the state failed to provide a plan in a particular case or that the plan it provided was unsatisfactory.

**c. Adoption Act § 675(5)(A) and (C)**

Sections 671(a)(16) and 622(b)(10)(B)(ii) require that a state plan provide, in addition to a case plan for each child, a "case review system." Section 675(5) defines "case review system." Under § 675(5)(A) a case review system is

> a procedure for assuring that ... each child has a case plan designed to achieve placement in a safe setting that is the least restrictive (most family like) and most appropriate setting available and in close proximity to the parents' home, consistent with the best interest and special needs of the child[.] [99]

And under § 675(5)(C) the case review system must create a procedure for ensuring that

> with respect to each ... child, procedural safeguards will be applied ... to assure each child in foster care under the supervision of the State of a permanency hearing to be held, in a family or juvenile court or another court (including a tribal court) of competent jurisdiction, or by an administrative body appointed or approved by the court, no later than 12 months after the

sions, taken alone, could create enforceable rights.

**96.** Webster's Third New International Dictionary 1929 (3d ed.1969).

**97.** 42 U.S.C. § 671(a) (2005) (emphasis added).

**98.** 42 U.S.C. § 675(1)(B) (2005).

**99.** 42 U.S.C. § 675(5)(A) (2005).

date the child is considered to have entered foster care ... (and not less frequently than every 12 months thereafter during the continuation of foster care), which hearing shall determine the permanency plan for the child that includes whether, and if applicable when, the child will be returned to the parent, placed for adoption and the State will file a petition for termination of parental rights, or referred for legal guardianship, or (in cases where the State agency has documented to the State court a compelling reason for determining that it would not be in the best interests of the child to return home, be referred for termination of parental rights, or be placed for adoption, with a fit and willing relative, or with a legal guardian) placed in another planned permanent living arrangement and, in the case of a child described [placed out of state], whether the out-of-State placement continues to be appropriate and in the best interests of the child, and, in the case of a child who has attained age 16, the services needed to assist the child to make the transition from foster care to independent living; and procedural safeguards shall also be applied with respect to parental rights pertaining to the removal of the child from the home of his parents, to a change in the child's placement, and to any determination affecting visitation privileges of parents[.] [100]

As with § 675(1)(B), we conclude that these sections create enforceable rights under the *Blessing/Gonzaga* test. Both provisions are expressly directed toward individual children. Section 675(5)(A) requires that procedures be established to ensure that each child has a case plan. Where § 675(1)(B) creates a right to have a case plan and that specific elements be addressed in the case plan, § 675(5)(A) creates procedural rights to ensure that the child's substantive rights under § 675(1)(B) are met. Similarly, § 675(5)(C) requires that the state establish procedures for ensuring that the necessary hearings be held and that

children not be moved or placed without the required hearings. These sections satisfy the first prong of the *Blessing/Gonzaga* test. They also satisfy the second prong of the test. These sections require that procedures be established; this requirement, like the requirement that the state must have a plan to develop individual case plans, is not too vague or amorphous to be enforceable. Finally, these sections are mandatory; they therefore satisfy the third prong of the *Blessing/Gonzaga* test.

But while we agree with the superior court that these sections create enforceable rights, we add the same cautionary note we sounded with respect to § 675(1)(B): We view these sections as describing an enforceable right that is systematic—a right to "a case review *system*" that complies with the statutory specifications. This right does not imply the further right to insist on case-by-case compliance; nor does it create a case-specific right to sue for lack of compliance. These provisions give the state leeway to determine what case-review procedures are necessary to protect the rights of individual parents and children; they do not authorize suits alleging that better procedures could have been used on specific occasions.

### 2. Indian Child Welfare Act

■■■ The state does not contest the villages' claim that the Indian Child Welfare Act creates rights that are enforceable under § 1983. Rather, the state argues that because the Indian Child Welfare Act provides a remedy for violations of some of its provisions, that remedy displaces any remedies that would otherwise be available under § 1983. The state relies on the Supreme Court's repeated assertion that once a party has shown that a right has been deprived under color of state law, "[section] 1983 provides a remedial cause of action unless the state actor demonstrates by express provision or other specific evidence from the statute itself that Congress intended to foreclose such private enforcement." [101]

---

**100.** 42 U.S.C. § 675(5)(C) (2005). We note that AS 47.10.080 and CINA Rule 17.2 incorporate many of these requirements.

**101.** *Wright v. City of Roanoke Redevelopment & Hous. Auth.,* 479 U.S. 418, 423, 107 S.Ct. 766, 93 L.Ed.2d 781 (1987).

In *Middlesex County Sewerage Authority v. National Sea Clammers Ass'n,*[102] *Smith v. Robinson,*[103] and, most recently, in *City of Rancho Palos Verdes v. Abrams,*[104] the Supreme Court has explained the factors that are necessary for determining whether Congress intended to foreclose the remedies that are normally available under § 1983. The Court has established that Congress may explicitly preclude reliance on § 1983.[105] But Congress may also implicitly withdraw § 1983 as a remedy.[106]

The Court has held that where a rights-creating statute also includes its own statutory remedy, the statute creates a presumption that Congress intended that § 1983 *not* be available to remedy violations of the right: "[t]he provision of an express, private means of redress in the statute itself is ordinarily an indication that Congress did not intend to leave open a more expansive remedy under § 1983."[107] But this presumption is, the Court has held, rebuttable. "The ordinary inference that the remedy provided in the statute is exclusive can surely be overcome by textual indication, express or implicit, that the remedy is to complement, rather than supplant, § 1983."[108]

These decisions suggest three relevant factors to consider in determining whether a statutory remedy displaces § 1983. First, where a statute provides its own remedy, a court should consider whether the remedy would normally be available under § 1983 or whether, instead, the remedy expands upon those available under § 1983.[109] Second, a court should determine whether the statutory remedy creates procedural limitations that are more stringent than those provided in § 1983.[110] In all three of the cases in which the Court has held that a statutory remedy displaces § 1983, the Court has stressed that the procedures for enforcing the statutory remedy were more limited than the procedures under § 1983.[111] Where a plaintiff's reliance on § 1983 would undermine the statutory remedy or would allow a plaintiff to avoid the limitations created by a statutory remedy, the Court has indicated that § 1983 should be held to have been displaced—"that limitations upon the remedy contained in the statute are deliberate and are not to be evaded through § 1983."[112] Finally, a court should consider whether allowing a party to proceed under § 1983 would be inconsistent with the compromises reached in the statute.[113]

Applying this three-factor test to the remedial provisions of the Indian Child Welfare Act convinces us that Congress intended to preserve the remedies available under § 1983.

### a. Section 1914 creates a remedy that is unavailable under § 1983.

Section 1914 of the Indian Child Welfare Act provides:

> Any Indian child who is the subject of any action for foster care placement or termination of parental rights under State law, any parent or Indian custodian from whose custody such child was removed, and the Indian child's tribe may petition any court of competent jurisdiction to invalidate such action upon a showing that such action violated any provision of sections 1911,

**102.** 453 U.S. 1, 101 S.Ct. 2615, 69 L.Ed.2d 435 (1981).

**103.** 468 U.S. 992, 104 S.Ct. 3457, 82 L.Ed.2d 746 (1984).

**104.** 544 U.S. 113, 125 S.Ct. 1453, 161 L.Ed.2d 316 (2005).

**105.** *Id.* at 122, 125 S.Ct. 1453.

**106.** *Id.*

**107.** *Id.* at 121, 125 S.Ct. 1453.

**108.** *Id.* at 122, 125 S.Ct. 1453.

**109.** *Id.* at 121–22, 125 S.Ct. 1453.

**110.** *Id.* at 122, 125 S.Ct. 1453.

**111.** *Id.* at 121, 125 S.Ct. 1453; *Sea Clammers,* 453 U.S. at 8, nn. 9 & 11, 101 S.Ct. 2615; *Smith,* 468 U.S. at 1010–12, 104 S.Ct. 3457.

**112.** *Abrams,* 544 U.S. at 124, 125 S.Ct. 1453.

**113.** *See id.* at 128–29, 125 S.Ct. 1453 (Breyer, J., concurring); *Smith,* 468 U.S. at 1009–12, 104 S.Ct. 3457.

1912, and 1913 of this title.[114]

Section 1914 allows an aggrieved party to go into federal or state court and seek to have a foster placement or a termination of parental rights invalidated. We believe that most federal and state courts would agree that this federal remedy is not available under § 1983. By its terms, § 1983 "confers authority to grant equitable relief as well as damages, but its words 'allow a suit in equity only when that is the proper proceeding for redress, and they refer to existing standards to determine what is a proper proceeding.' " [115]

■ Section 1914 attempts to give the federal courts jurisdiction to invalidate a state court judgment terminating a parent's rights. The federal courts do not ordinarily have this jurisdiction because under the *Rooker–Feldman* doctrine, "a United States District Court has no authority to review final judgments of a state court in judicial proceedings." [116] The only federal court that may review a state court judgment is the United States Supreme Court.[117] The United States District Courts

> do not have jurisdiction ... over challenges to state court decisions in particular cases arising out of judicial proceedings even if those challenges allege that the state court's action was unconstitutional.

Review of those decisions may be had only in this Court.[118]

The federal courts have indicated, mostly in unpublished decisions, that this doctrine applies to cases in which a parent seeks to invalidate a state court's order terminating parental rights.[119] Without § 1914, then, Indian parents, tribes, custodians, and children would be unable to seek invalidation of a termination order in the federal courts, regardless of whether the state court had complied with the Indian Child Welfare Act. Such a remedy would not be available under § 1983.

We recognize that, despite § 1914's intent to confer jurisdiction on the federal courts, litigants have often had difficulty vindicating their rights under the Indian Child Welfare Act due to doctrines that preclude federal court review of state court decisions, such as collateral estoppel and abstention.[120] But even so, because § 1914 creates a federal remedy that would not be available at all, it broadens the relief that an injured party could seek. In *Abrams,* the Court seems to suggest that whether a statute adds remedies to those available under § 1983 is a relevant factor to consider when determining whether the statutory framework was intended to displace § 1983.[121] Therefore, the rele-

---

**114.** 25 U.S.C. § 1914 (2005).

**115.** *Rizzo v. Goode,* 423 U.S. 362, 378, 96 S.Ct. 598, 46 L.Ed.2d 561 (1976) (quoting *Giles v. Harris,* 189 U.S. 475, 486, 23 S.Ct. 639, 47 L.Ed. 909 (1903)).

**116.** *Dist. of Columbia Court of Appeals v. Feldman,* 460 U.S. 462, 482, 103 S.Ct. 1303, 75 L.Ed.2d 206 (1983).

**117.** *Id.*

**118.** *Id.* at 486, 103 S.Ct. 1303.

**119.** *See, e.g., Rainey v. Samuels,* 130 Fed App'x 808, 810 (7th Cir.2005) (unpublished) (ruling that "section 1983 may not be used to obtain relief that implied the invalidity of a state court's judgment that binds the federal plaintiff *in personam* "); *Baker. v. Wayne County Family Independence Agency,* 75 Fed App'x 501 (6th Cir. 2003) (unpublished); *Umtuch v. Hoyt,* 163 F.3d 609, 1998 WL 658640, *1 (9th Cir.1998) (unpublished) (ruling that parent could not "challenge

collaterally the state court proceeding that resulted in the termination of her parental rights" because "[t]he federal courts ... are not a forum for appealing state court decisions"). *But see Bartell v. Lohiser,* 215 F.3d 550 (6th Cir.2000) (reviewing and, in effect, affirming a state court's termination of parental rights).

**120.** *See Kiowa Tribe of Okla. v. Lewis,* 777 F.2d 587, 590 (10th Cir.1985) (holding that res judicata prohibited § 1914 claim in federal court after the same issue had been raised in state court). *Cf. Native Vill. of Venetie IRA Council v. Alaska,* 944 F.2d 548, 554 n. 4 (9th Cir.1991) (holding that federal courts have jurisdiction to intervene when a state refuses to comply with the requirements of the Indian Child Welfare Act); *Doe v. Mann,* 285 F.Supp.2d 1229, 1234 (N.D.Cal.2003) ("This court finds that section 1914 grants federal courts the power to review state custody proceedings such as those here; therefore, the *Rooker–Feldman* doctrine does not apply to the action at bar.").

**121.** *Abrams,* 544 U.S. at 121, 125 S.Ct. 1453 ("[T]he existence of a *more restrictive* private

vant point here is that in passing § 1914, Congress attempted to provide a remedy that is not ordinarily available under § 1983. This factor weighs in favor of a conclusion that Congress intended § 1914 not to displace § 1983, but rather to supplement it.

### b. Section 1914 does not limit § 1983.

The next factor to consider is whether the statutory remedy places procedural limits on relief more stringent than the limits imposed under § 1983. Section 1914 does not contain a statute of limitations. When Congress does not establish " 'a time limitation for a federal cause of action, the settled practice has been to adopt a local time limitation as federal law if it is not inconsistent with federal law or policy to do so.' " [122] The United States Supreme Court has mandated that courts "borrow the most closely analogous state limitations period." [123] The limitations period will necessarily vary from state to state. We have determined, for instance, that challenges to adoptive placements brought under § 1914 are subject to Alaska's governing one-year statute of limitations, AS 25.23.240(b). [124]

■ Because "the statute of limitations for a § 1983 claim is generally the applicable state-law period for personal-injury torts," [125] the limitations period for a § 1983 action will also vary from state to state. In Alaska, the limitations period for personal injury actions is two years. [126] Although Congress' silent endorsement of borrowing state limitations in actions brought under § 1914 might lead to occasional differences between the time limits for bringing an action under § 1983 and

§ 1914, the resulting restriction on enforcement under § 1914 does not seem sufficiently uniform or comprehensive to imply that Congress intended to bar Indian Child Welfare Act provisions from being enforced under § 1983. [127] Moreover, the risk of conflicting limitations periods is further reduced by the type of § 1983 relief the villages seek here: the villages hope to use § 1983 to obtain injunctive and declaratory relief, not to invalidate a particular foster care placement or termination of parental rights. In short, § 1914's silence on the issue of time limits for filing an action cannot reasonably be construed as an attempt to displace the broader range of relief offered under § 1983.

### c. Allowing a § 1983 action is not incompatible with the Indian Child Welfare Act.

Finally, and most significantly, § 1983 is not inconsistent with and would not undermine the Indian Child Welfare Act. In *Abrams*, the Court observed that enforcement of the rights created in the Telecommunications Act "through § 1983 would distort the scheme of expedited judicial review and limited remedies created by" the statute. [128] The concurring four Justices noted their belief that "to permit § 1983 actions here would undermine the compromise ... that the statute reflects." [129]

In contrast, allowing the villages to proceed with the sort of action they press here would neither undermine nor distort the purposes of the Indian Child Welfare Act. The Indian Child Welfare Act of 1978 "was the product of rising concern in the mid–1970's

remedy ... has been the dividing line between those cases in which we have held that an action would lie under § 1983 and those in which we have held that it would not.") (emphasis added).

122. *In re Adoption of Erin G.*, 140 P.3d 886, 891 (Alaska 2006) (quoting *Wilson v. Garcia*, 471 U.S. 261, 266–67, 105 S.Ct. 1938, 85 L.Ed.2d 254 (1985)).

123. *Graham County Soil & Water Conservation Dist. v. U.S. ex rel. Wilson*, 545 U.S. 409, 414, 125 S.Ct. 2444, 162 L.Ed.2d 390 (2005).

124. *In re Adoption of Erin G.*, 140 P.3d at 893 (AS 25.23.140(b) requires that challenges to an adoption decree be brought within one year).

*Cf.* DEL.CODE ANN. tit. 13, § 917 (2006) (attack of adoption decree permitted within thirty days).

125. *Abrams*, 544 U.S. at 124 n. 5, 125 S.Ct. 1453.

126. AS 09.10.070; *Sengupta v. Univ. of Alaska*, 21 P.3d 1240, 1249 (Alaska 2001).

127. *Cf. Blessing*, 520 U.S. at 341, 117 S.Ct. 1353 ("Congress may ... forbid[] recourse to § 1983 ... impliedly, by creating a comprehensive enforcement scheme that is incompatible with individual enforcement under § 1983.").

128. *Abrams*, 544 U.S. at 127, 125 S.Ct. 1453.

129. *Id.* at 128–29, 125 S.Ct. 1453 (Breyer, J., concurring).

over the consequences to Indian children, Indian families, and Indian tribes of abusive child welfare practices that resulted in the separation of large numbers of Indian children from their families and tribes through adoption or foster care placement, usually in non-Indian homes." [130]  The statute's preliminary findings reiterate this concern. Congress found

that there is no resource that is more vital to the continued existence and integrity of Indian tribes than their children and that the United States has a direct interest, as trustee, in protecting Indian children who are members of or are eligible for membership in an Indian tribe;

... that an alarmingly high percentage of Indian families are broken up by the removal, often unwarranted, of their children from them by nontribal public and private agencies and that an alarmingly high percentage of such children are placed in non-Indian foster and adoptive homes and institutions; and

... that the States, exercising their recognized jurisdiction over Indian child custody proceedings through administrative and judicial bodies, have often failed to recognize the essential tribal relations of Indian people and the cultural and social standards prevailing in Indian communities and families.[131]

And the statute's statement of purpose indicates that it was created to remedy these problems.

The Congress hereby declares that it is the policy of this Nation to protect the best interests of Indian children and to promote the stability and security of Indian tribes and families by the establishment of minimum Federal standards for the removal of Indian children from their families and the placement of such children in foster or adoptive homes which will reflect the unique values of Indian culture, and by providing for assistance to Indian tribes in the operation of child and family service programs.[132]

The Act establishes a system for ensuring tribal participation in state procedures for placing Native children and provided for tribal court jurisdiction over many child welfare proceedings. In addition, the Act creates a series of procedural safeguards that limit the circumstances under which Indian children may be removed from their family homes.

The villages seek in this action to use § 1983 to require the state to comply with the statutory requirements of the Indian Child Welfare Act. The state, on the other hand, argues that the Act cannot be enforced this way because Congress did not so intend; such enforcement could upset the balance Congress struck between a number of interests, such as the rights of tribes, Indian parents, and Indian children. Although it is true that Congress balanced competing factors when passing the Act, allowing this action to proceed would not undermine or even affect any of these compromises.

Moreover, allowing the villages to go forward with their § 1983 action would in no way undermine the remedial effects of § 1914. Regardless of whether the villages are allowed to proceed, individual parents, children, guardians, and tribes will still be able to invalidate improper placements and improper terminations of parental rights. The villages' action will not undermine this remedy, nor will it allow the villages to circumvent any procedural limitations. We therefore conclude that § 1914 was intended not to displace, but rather to supplement the remedies available under § 1983.[133]

### E. Remedy

In addition to the issue we have already discussed, the state objects to one of the remedies the villages seek. To supplement the declaratory and injunctive relief they request, the villages asked the superior court

**130.** *Miss. Band of Choctaw Indians v. Holyfield,* 490 U.S. 30, 33, 109 S.Ct. 1597, 104 L.Ed.2d 29 (1989).

**131.** 25 U.S.C. § 1901(3)-(5) (2005).

**132.** 25 U.S.C. § 1902 (2005).

**133.** Nothing in this opinion should be taken to imply any view as to whether a damage remedy might be available under § 1983 for violations of rights created by the Adoption Act and the Indian Child Welfare Act.

to "[a]ppoint a panel of experts, including Alaska Native members with experience in child welfare issues, with full access to the defendants, their records and their personnel, to develop and oversee the implementation of a plan for reform, to ensure that defendants protect the constitutional and statutory rights of the plaintiff tribes and their members." The state argues that this remedy would infringe the state's special sovereignty interests and would therefore run afoul of the Supreme Court's recently created exception to *Ex parte Young* suits. In *Idaho v. Coeur d'Alene of Idaho*, the Supreme Court held that a plaintiff may not bring an *Ex parte Young* suit in federal court claiming a right to the ownership of and jurisdiction over submerged lands claimed by the state.[134] Because such an action implicates "special sovereignty interests," the suit is not merely a suit against a state officer, but is, in effect, a suit against the state itself.[135] The state argues that appointing a panel of experts to oversee the child welfare system would similarly invade the state's special sovereignty interests and that this portion of the suit should therefore be dismissed.

We need not consider whether *Coeur·d'Alene* would prohibit the extraordinarily invasive remedy the tribes seek. This case comes before us on a petition to review the superior court's refusal to dismiss some of the villages' claims. The case is therefore still in its preliminary stages. It would be premature for us to evaluate the propriety of a requested remedy where there has been little discovery and no trial, much less a verdict in the villages' favor. Unless or until the villages have actually prevailed on the merits of their claims and have shown their entitlement to receive *some* remedy, we think it premature to decide in the abstract whether the particular remedy they now propose would infringe upon the state's core sovereignty interests.

## IV. CONCLUSION

For the foregoing reasons, we AFFIRM the superior court's ruling that the villages are proper plaintiffs to bring *parens patriae* claims under § 1983. We REVERSE the superior court's ruling that the villages may bring claims on their own behalf under § 1983. We REVERSE the superior court's ruling that the villages may bring claims against the state for violations of the Adoption Act, but we AFFIRM the court's conclusion that the villages may bring claims against Tom Cherian in his official capacity for violations of the Adoption Act and the Indian Child Welfare Act, and we REMAND for further proceedings consistent with this opinion.

---

**134.** 521 U.S. at 265, 287–88, 117 S.Ct. 2028.

**135.** *Id.* at 281–88, 117 S.Ct. 2028.