RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit Rule 206
File Name: 09a0219p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

_____

KEWEENAW BAY INDIAN COMMUNITY,

                *Plaintiff-Appellant,*

     *v.*

JAY RISING, et al.,

               *Defendants-Appellees.*

No. 08-1585

Appeal from the United States District Court
for the Western District of Michigan at Marquette.
No. 05-00224—Gordon J. Quist, District Judge.

Argued: April 30, 2009

Decided and Filed: June 26, 2009

Before: MERRITT, GRIFFIN, and KETHLEDGE, Circuit Judges.

_____

**COUNSEL**

**ARGUED:** Vernle Charles Durocher, Jr., DORSEY & WHITNEY LLP, Minneapolis, Minnesota, for Appellant. Kevin Joseph Moody, MILLER, CANFIELD, PADDOCK & STONE, P.L.C., Lansing, Michigan, for Appellees. **ON BRIEF:** Vernle Charles Durocher, Jr., DORSEY & WHITNEY LLP, Minneapolis, Minnesota, for Appellant. Kevin Joseph Moody, Jaclyn S. Levine, MILLER, CANFIELD, PADDOCK & STONE, P.L.C., Lansing, Michigan, B. Eric Restuccia, OFFICE OF THE MICHIGAN ATTORNEY GENERAL, Lansing, Michigan, for Appellees.

_____

**OPINION**

_____

     MERRITT, Circuit Judge. The body of federal law governing Indian immunity from state taxation arises from the Commerce Clause, which grants to Congress the power "to regulate commerce with foreign Nations, and among the several States, and with the Indian Tribes," and laws passed pursuant thereto. Under the Declaratory Judgment Act, 28 U.S.C. § 2201 (a federal court may "declare the rights" of the parties only in "a case of actual

1

controversy"), the Keweenaw Bay Indian Community seeks (1) a broad declaration concerning its tax immunities under federal law, and (2) injunctive relief from Michigan's policy of taxing transactions involving the Community and from Michigan's reliance on an informal refund process to sort those immunities out on a case-by-case, transaction-by-transaction basis. Because the questions presented cover a myriad of hypothetical transactions and are too broad, too abstract, and unsupported by specific facts, the relief requested cannot be granted at this time. Lacking a specific factual context, the questions are not justiciable. The Community also appeals the District Court's conclusion that the Community does not qualify as a "person" within the meaning of 42 U.S.C. § 1983 for purposes of its suit against members of the State Treasury department. Further factual development of the record is necessary before this issue can be fully resolved, and we remand the case for further proceedings on this issue.

## I. Background

The Keweenaw Bay Indian Community is a federally recognized Indian tribe and the successor in interest to the L'Anse and Ontonagon bands of Chippewa Indians. The Community exercises powers of self-governance and sovereign jurisdiction over the L'Anse Indian Reservation in the Upper Peninsula of Michigan, as well as over extensive lands held in trust by the United States outside the reservation in the western half of the Upper Peninsula. The reservation itself, not counting the trust lands, comprises nearly 60,000 acres, upon which reside roughly 893 of the 3,339 enrolled members of the Community.[1]

In 1977, Michigan and the Community entered into a comprehensive tax agreement governing payment and collection of sales and use taxes for transactions involving the Community or its members. In 1994, the parties began renegotiating this agreement, but failed to reach accord. In 1997, Michigan terminated its tax agreements with the twelve federally recognized tribes in the State, as part of an effort to achieve uniformity in its agreements with the tribes. Although the State has reached agreement with most of the Michigan tribes, it has failed to reach agreement with the Community.

---

[1] The history of the Community is set out in *Keweenaw Bay Indian Community v. Naftaly*, 452 F.3d 514 (6th Cir. 2006). The Community has an extensive local government and operates a number of services, programs, and enterprises, including tribal casinos in Baraga and Marquette, Michigan. *See* www.kbic-nsn.gov.

In the absence of any such agreement, Michigan has apparently adopted a policy of taxing transactions involving the Community or its members, while permitting them to apply to the Treasury for an exemption or refund on a case-by-case basis. The State claims that the Community has flouted this policy and refused to pay many of its taxes. Not surprisingly, the parties have repeatedly disputed the amount of taxes the Community owes to the State, and each has withheld funds that the other party claims it is owed. Most notably for our purposes, in 2005 the State withheld $34,166.31 in federal funds owed to the Community, which the State offset from the back taxes that it maintained the Community owed.

In 2006, the Community filed this lawsuit, primarily seeking declaratory and injunctive relief from the State's collection of sales and use taxes on transactions involving the Community or its members. Defendants are four Michigan officials, who are sued in both their individual and official capacities.[2] The Community also seeks damages under 42 U.S.C. § 1983, alleging that the 2005 offset of federal funds violated various constitutional and statutory rights. The District Court granted judgment for the State on all issues, *see Keweenaw Bay Indian Cmty. v. Kleine*, 546 F. Supp. 2d 509 (W.D. Mich. 2008), some of which, based on Eleventh Amendment immunity and other grounds, have not been appealed. The Community now presents us with three questions, which we quote from its opening brief and will address in turn:

> (1) Whether the district court erred in failing to hold that federal law categorically prohibits imposition of Michigan's sales and use taxes with respect to the Community's and its members' purchase and use of property and services within the Community's reservations and trust lands.
>
> (2) Whether the district court erred in dismissing the Community's claims based on the 1842 Treaty seeking declaratory and injunctive relief regarding imposition of Michigan's sales and use taxes with respect to the Community's and its members purchase and use of property and services in the area ceded under that treaty.

---

[2]Specifically, Jay Rising is the Treasurer of the State of Michigan, Michael Reynolds is the Administrator of the Collection Division of the Michigan Department of the Treasury, Walter Fratzke is the Native American Affairs Specialist of the Michigan Department of the Treasury, and Terri Lynn Land is the Secretary of State.

(3) Whether the district court erred in holding that the federal rights underlying the Community's claim based on 42 U.S.C. § 1983 are rights that emanate from the Community's sovereign status, rather than rights equally available to any person.

## II.  The "Categorical" Prohibition on Michigan Sales and Use Taxes

The Michigan Sales Tax Act, M.C.L. §§ 205.51-205.78, imposes a 6% tax on the gross proceeds from retail sales of tangible personal property in Michigan.  The parties agree that the legal incidence of the tax falls on the retailer under M.C.L. § 205.52(1) and *Sims v. Firestone Tire & Rubber Co.*, 245 N.W.2d 13, 15 (Mich. 1976).  The Michigan Use Tax Act, M.C.L. §§ 205.91-205.111, imposes a one-time tax "for the privilege of using, storing, or consuming tangible personal property in [Michigan] at a rate equal to 6% of the price of the property or services."  M.C.L. § 205.93(1).  The tax is imposed only on transactions not subject to the sales tax, and the parties agree that the purchaser bears the legal incidence of the use tax under M.C.L. § 205.97.

The Community first asks us to explicate, as a part of a formal declaration, the relevant Supreme Court holdings on state taxation of Indians.  This body of federal law is concededly "intricate" and "vexing."  *Washington v. Confederated Tribes of the Colville Indian Reservation*, 447 U.S. 134, 138 (1980).  And it is not surprising, therefore, that Michigan's briefs and statements at oral argument may misstate the law in certain respects, such as the preemptive effect of the Indian trader statutes, 25 U.S.C. §§ 261-264, or the necessity of apportioning the use tax under certain circumstances.  But, as the District Court noted, the Community has not pointed to a single example of the State refusing to refund a tax that it is prohibited by federal law from collecting.  Until it does so, our attempted clarification of the relevant law and the exposition of a "categorical" legislative-type set of rules would be purely academic.  We assume that the parties are fully capable of reading and synthesizing the body of federal law governing state taxation of Indians.  Until we see some evidence that one party has erred in doing so *and* put that mistaken belief into practice, we have no inclination — and probably no jurisdiction — to issue a formal declaration on the subject.  If the Community files, and the State denies, a request for an exemption or refund based on a

transaction occurring within Indian country and involving a member of the Community, the courthouse doors will be open to an appropriate challenge.

The Community also asks us to declare invalid the State's purported policy of taxing all transactions in the first instance and using the Informal Process to determine which taxes can validly be collected. The absence of factual development in the record prevents us from doing so. There may be certain types of sales for which the Informal Process is invalid because it is "not reasonably necessary as a means of preventing fraudulent transactions." *Colville,* 447 U.S. at 160. For example, parts of the record suggest that the State may require even Indian retailers located on the reservation to collect sales tax from Indian consumers, even though these transactions are clearly nontaxable absent congressional authorization, since the legal incidence of the sales tax falls on the Indian retailer. *See Okla. Tax Comm'n v. Chickasaw Nation*, 515 U.S. 450, 459 (1995) (explaining that if a sales tax is imposed on an Indian retailer for sales within Indian country, "the tax cannot be enforced absent clear congressional authorization"). But the record does not clearly indicate whether the State does in fact require collection for such transactions, and we will not issue a declaration concerning a practice that may not be occurring. Furthermore, if the State seeks to impose the use tax on products sold by Indian retailers to non-Indian consumers (a fact that we again do not know), the relevant minimal-burdens analysis might come out differently.

It is perhaps possible that a purported, comprehensive policy of tax-it-all-and-let-treasury-sort-it-out is invalid because it exceeds the minimal burdens that federal law allows the State to place on Indians or Indian tribes. But we do not have before us enough facts to reach that conclusion here. Generally, whether a particular method for differentiating between taxable and nontaxable transactions is reasonable depends in part on the number of each that occurs; and we have no information, for example, about the number of within-Indian-country sales that occur between a non-Indian retailer and a non-Indian buyer — transactions that the Community concedes are taxable. Likewise, it may be that there are a large number of sales in which there is a legitimate dispute over whether the sale takes place within Indian country or not. For example, what happens

when an Indian orders a product or service online — say a magazine, book, educational service, or any one of hundreds of similar items — pays for it using a debit card that draws from a bank outside of Indian country, and the product is delivered within Indian country? That question, and similar variations thereof, have not been resolved and are not properly before us. Without knowing the answers, and without knowing how often such transactions occur, we cannot reach the broad conclusion, asserted by the Community, that the State may not rely on the Informal Process to sort out the Community's tax liability.

In judicial law, as opposed to legislative law, decisions should grow out of the specific facts of a case, not the application of abstract concepts to a myriad of potentially hypothetical transactions. *See United Pub. Workers of Am. v. Mitchell*, 330 U.S. 75, 89-90 (1947) (explaining that, under the Declaratory Judgment Act, judges are empowered to decide cases "only when the interests of litigants require the use of this judicial authority for their protection against actual interference. A hypothetical threat is not enough."). The great body of legal precedent and concepts developed through the common law method of adversary adjudication over the centuries resulted from disputes about actual facts. This type of judge-made law arose from adversary contests over specific facts, the nuances and variations of which mold the law. The Declaratory Judgment Act does not abandon that model.

An abstract decision in this case would not meet the test for declaratory judgments because it would not "settle the controversy" or "serve a useful purpose in clarifying the legal relations" involved in these particular circumstances. *See Grand Trunk W. R.R. Co. v. Consol. Rail Co.*, 746 F.2d 323, 326 (6th Cir. 1984). Furthermore, there is "an alternative remedy which is better or more effective," *see id.*, namely a challenge to a particular determination or set of determinations made by the State taxing authority. We, therefore, conclude that the Community is not entitled to the declaratory and injunctive relief it requests, though we reiterate that it is possible that such relief may ultimately be attained through appropriately fact-specific litigation.

The District Court relied on a similar consideration of ripeness, combined with its discretion under the Declaratory Judgment Act, to decline to resolve many of the hypothetical tax issues presented in this case, while apparently resolving other hypothetical issues in the State's favor on the merits. We agree with the District Court's discussion of these justiciability doctrines, but believe that none of those sales and use tax issues referred to in Question 1 should be resolved in this case and should await litigation arising from actual rather than hypothetical cases or transactions. On remand, the court should dismiss the tax-related claims for being unripe because they are too abstract and hypothetical and, therefore, unsuitable for declaratory judgment.

### III. The 1842 Treaty

In an 1842 treaty, the Chippewa Indians ceded the western half of Michigan's Upper Peninsula and portions of northern Wisconsin to the United States. Article II of that treaty provides that, in this ceded area, "the laws of the United States shall be continued in force, in respect to [the Indians'] trade and intercourse with the whites, until otherwise ordered by Congress." The second issue on appeal — whether that treaty affects the disposition of the Community's claims for declaratory and injunctive relief regarding the same Michigan taxes referred to in Question 1 — cannot be answered here, for the same reasons laid out above. To the extent that the Community contends that the treaty creates an independent barrier to state taxation of transactions with Indians in the ceded area, that argument was rejected by this Court in *Keweenaw Bay Indian Community v. Rising* (*Rising I*), 477 F.3d 881, 893 (6th Cir. 2007). To the extent, however, that the Community merely contends that the rules regarding State taxation of Indians must be the same in the ceded territory as it is on the reservation, that question is not properly before us. Ultimately, it would seem to be a question of whether the ceded territory is Indian country within the meaning of 18 U.S.C. § 1151. But because we are not able to give the Community the sweeping declaratory and injunctive relief that it requests with regard to the myriad of hypothetical transactions in Question 1, we decline to grant a broad declaratory judgment as to Question 2.

## IV.  The Community's § 1983 Claim

The final issue on appeal concerns the Community's § 1983 action against defendants Rising, Reynolds, and Fratzke for allegedly violating the Community's constitutional and statutory rights by offsetting federal funds that the state was obligated to transfer to the Community.  In 1995, the State audited the Community's payment of sales and use taxes from 1993 and 1994 and determined that the Community owed $186,277 in back taxes.  After two attempts (not at issue on appeal) to offset those taxes, the State in 2005 offset $34,166.31 in federal funds, consisting primarily of funding for Medicaid and the Special Supplemental Nutrition Program for Women, Infants, and Children, also known as WIC.  The Community claims that this offset violated its Fourth, Fifth, and Fourteenth Amendment rights, as well as statutory rights created by the federal programs whose funds were offset.[3]  The District Court concluded that, based on the rights it was asserting, the Community was not a "person" within the meaning of § 1983[4] and, therefore, not entitled to bring suit.

In *Inyo County v. Paiute-Shoshone Indians*, the Supreme Court considered "whether a tribe qualifies as a claimant — a 'person within the jurisdiction' of the United States — under § 1983."  538 U.S. 701, 709 (2003) (emphasis omitted).  The Court reviewed how it had treated this question in other statutory contexts and explained that whether a sovereign entity is "a 'person' who may maintain a particular claim for relief depends not upon a bare analysis of the word 'person,' but on the legislative environment in which the word appears."  *Id.* at 711 (2003) (quotations and citations omitted).  That is, whether a sovereign entity may be considered a "person" depends on

---

[3]The Community relies on 31 U.S.C. § 1301(a) (stating that "[a]ppropriations shall be applied only to the objects for which the appropriations were made except as otherwise provided by law"); 42 U.S.C. § 618(b)(1) ("Amounts received by a State under this section shall only be used to provide child care assistance"); 42 U.S.C. § 618(c) ("Notwithstanding any other provision of law, amounts provided to a State under this section shall be transferred to the lead agency under the Child Care and Development Block Grant Act of 1990 . . . ."); and 42 U.S.C. §§ 629-629i, 1396-1396c, 1786, and 9858c-g.

[4]Section 1983 provides: "Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured . . . ."  42 U.S.C. § 1983.  It is the second use of person that is at issue — whether the Community is a "person within the jurisdiction" of the United States.

the specific rights that it is asserting. *See, e.g.*, *Pfizer, Inc. v. Gov't of India*, 434 U.S. 308 (1978) (holding that a foreign nation, as a purchaser of antibiotics, was a "person" when suing pharmaceutical manufacturers for violating antitrust laws); *Georgia v. Evans*, 316 U.S. 159 (1942) (holding that a State, as a purchaser of asphalt, was a "person" when suing under the Sherman Act for restraint of trade). In *Inyo County*, the tribe's § 1983 action was based on an asserted violation of its sovereign immunity from searches conducted pursuant to duly executed search warrants. *Inyo County*, 538 U.S. at 706. That is, it was "only by virtue of the Tribe's asserted 'sovereign' status that it claim[ed] immunity from the County's processes." *Id.* at 711. Noting that § "1983 was designed to secure private rights against government encroachment, not to advance a sovereign's prerogative to withhold evidence relevant to a criminal investigation," the Court held "that the Tribe may not sue under § 1983 to vindicate the sovereign right it here claims." *Id.* at 712 (citation omitted).

There are at least two plausible ways to interpret the Court's *Inyo County* decision.[5] First, it could be that a tribe is not a "person" within the meaning of § 1983 whenever it sues to vindicate rights that are rooted in its status as a sovereign, or have some connection to its sovereignty. Second, it could be that a tribe is not a "person" only when it sues to vindicate its sovereign immunity specifically, as in *Inyo County*. The District Court adopted the former reading of *Inyo County*, noting that "despite the many counts, theories, briefs, and arguments, this case is about the sovereignty of the Community," and that "the Community is entitled to these funds only because it is a sovereign." *Keweenaw Bay*, 546 F. Supp. 2d at 522.

On appeal, the Community argues that the District Court erred under either reading of *Inyo County* because the funds owed to the tribe were not dependent on its

---

[5]The State suggests a third reading — that *Inyo County* stands for the proposition that "Indian tribes cannot be considered a 'person' within the meaning of § 1983 and, therefore, cannot be claimants under this statute." Br. of Appellees at 54. As this Court noted in *Rising I,* "Of course the Community has a private right of action to sue for violations of its Constitutional rights under 42 U.S.C. § 1983." 477 F.3d at 894 n.6. The State waves this away as mere dicta. But even if that is so, the State's argument would render the *Inyo County* Court's focus on "the 'legislative environment' in which the word appears" and its distinction between private rights and sovereign rights completely superfluous and nonsensical, since it could merely have held, as the State suggests, that "Indian tribes cannot be considered a 'person'" and stopped there.

sovereign status. The Community views itself as acting somewhat like a trustee in connection with the receipt and distribution of these funds. According to the Community, it "receives these funds not because it is a sovereign, but because it operates a medical clinic that serves patients who qualify for Medicaid benefits and is a 'local WIC agency' designated by the State of Michigan to serve needy women, infants, and children." Br. of Appellant at 55. If this is accurate, then the Community's status as a sovereign is incidental to the rights it is asserting — it could have been owed the money if it were any of "[n]umerous private nonsovereign organizations [that] also receive Medicaid and WIC program funds," in which case it would likely be able to sue under § 1983. *See Primera Iglesia Bautista Hispana of Boca Raton, Inc. v. Broward County*, 450 F.3d 1295, 1305 (11th Cir. 2006) ("We have clearly and repeatedly held that corporations are 'persons' within the meaning of section 1983."); *cf. First Nat'l Bank of Boston v. Bellotti*, 435 U.S. 765, 780 n.15 (1978) ("It has been settled for almost a century that corporations are persons within the meaning of the Fourteenth Amendment"). In other words, if the Community is correct, the rights at issue accrued to it simply because it provides healthcare and social services; if those rights can otherwise be vindicated under § 1983, the Community's status as a sovereign would not vitiate that ability any more than, for example, Georgia's status as a sovereign would vitiate its ability to sue under the Sherman Act in its capacity as a buyer, *see Evans*, 316 U.S. at 162-63. We, therefore, remand this case to the District Court to determine whether the Community was entitled to the federal funds (a) only as a result of its sovereignty, or (b) simply because it provides certain social services. If it is the latter, then Community's § 1983 suit would not be in any way dependent on its status as a sovereign, and it should be considered a "person" within the meaning of that statute, so long as other private, nonsovereign entities could likewise sue under § 1983.

The defendants also argue that they are entitled to summary judgment because the challenged offset was the result of a State computer program's automatic deduction, which occurred without defendants' direct involvement. That is, they contend that they cannot be liable because they merely failed to *prevent* the offset, without actively

participating in it themselves.  This issue was not addressed by the District Court, and we therefore do not address it here.

### V.  Conclusion

For these reasons, the judgment of the District Court is affirmed in part and vacated in part, and the case is remanded for further proceedings consistent with this opinion.