In the

# United States Court of Appeals
## For the Seventh Circuit

———————————

No. 24-1751

WAUKEGAN POTAWATOMI CASINO, LLC,

*Plaintiff-Appellant*,

*v.*

CITY OF WAUKEGAN,

*Defendant-Appellee*.

———————————

Appeal from the United States District Court for the
Northern District of Illinois, Eastern Division.
No. 20-cv-00750 — **John F. Kness**, *Judge*.

———————————

ARGUED OCTOBER 30, 2024 — DECIDED FEBRUARY 14, 2025

———————————

Before SCUDDER, ST. EVE, and KIRSCH, *Circuit Judges*.

KIRSCH, *Circuit Judge*. Waukegan Potawatomi Casino, LLC
(WPC) says its Fourteenth Amendment rights were violated
when the City of Waukegan did not advance its casino pro-
posal for licensing consideration. WPC is convinced it experi-
enced intentional discrimination during the application pro-
cess—not as a protected class, but as a class of one. The district
court granted summary judgment for the City, reasoning that
tribal entities like WPC are not proper plaintiffs under

42 U.S.C. § 1983 and, in any event, that the claim failed as a matter of law. We affirm. WPC cannot carry its heavy burden as a class-of-one plaintiff, even assuming it could maintain such an action.

I

When the Illinois legislature authorized the Illinois Gaming Board to issue a casino license in the city of Waukegan, it tasked the City with certifying qualified applicants to the Gaming Board for consideration. Waukegan Potawatomi Casino, LLC (WPC) was one hopeful contender. WPC is an Illinois limited liability company fully owned by the Forest County Potawatomi Community of Wisconsin, descended from the Potawatomi Indian Tribe (the Potawatomi). Out of four candidates, WPC was the only one the City did not certify. To hear WPC tell it, this was the result of an application process rigged against it at each step. Indeed, WPC alleges that the City's review process was a sham designed to benefit another applicant, Lakeside Casino, LLC (Lakeside).

Because this case comes to us at the summary judgment stage, we construe the facts in the light most favorable to WPC and take all reasonable inferences in its favor. *FKFJ, Inc. v. Village of Worth*, 11 F.4th 574, 584 (7th Cir. 2021). This does not compel us to take "every conceivable inference" WPC suggests. *Id.* at 585 (quotation omitted). Nor do we vouch for the "objective truth of this account." *Brunson v. Murray*, 843 F.3d 698, 701 (7th Cir. 2016).

For an applicant to be eligible for consideration by the Gaming Board, the City had to certify that it met certain statutory requirements. 230 ILCS § 10/7(e-5). To accomplish this, the City asked interested parties to submit applications laying

out their proposed development plans for the casino. Five companies submitted proposals. After one withdrew, the final applicants were WPC, Lakeside, CDI-RSG Waukegan, LLC (Rivers), and Full House Reports, Inc. (Full House).

The proposals varied, as did the applicants' casino experience. One key difference related to the proposed terms for developing Fountain Square, the City-owned property earmarked for the casino. WPC offered to purchase the site for an amount equal to "+/- 15%" of the appraised value of the property. A June 2019 appraisal by the City valued Fountain Square at $5.625 million, but WPC was unaware of this appraisal and expected additional negotiations to solidify these terms. The other proposals offered anywhere from $11 million to $30 million to purchase the property, with various options for long-term leases, gaming revenues for the City, and annual guarantees for the City between $1 million and $3 million.

The proposals also differed in other respects, such as the square footage of the casinos, the number of gaming positions, and options for an entertainment complex, hotel, or temporary casino during construction. WPC's proposed casino was almost double the size of the next largest proposal, had the most gaming positions, and did not offer an entertainment complex, hotel, or temporary casino. The applicants brought different levels of experience to the table, as well. The Potawatomi operated two tribal casinos in Wisconsin. The other applicants each operated at least four casinos across multiple states.

Central to this dispute is the relationship between the City's then-mayor, Samuel Cunningham, and Michael Bond, a founding partner of Lakeside. Bond contributed generously

to Cunningham's mayoral campaign and was influential in the election of several City Council members. Cunningham initially assembled an internal committee to review the casino proposals, but several members had ties to Bond. Before long, a reporter emailed Cunningham about Bond's possible undue influence on the casino application process. The City began looking for an outside consultant the next day and retained C.H. Johnson Consulting soon thereafter.

As part of the review process, Johnson Consulting and City representatives met with each of the project teams. At these meetings, Johnson Consulting requested additional information from the applicants as needed. To that end, Full House was asked to provide estimated property tax information, projected revenues and expenses, and job creation figures that it had failed to include in its original proposal. Johnson Consulting followed up after the meeting by email, and Full House responded with the requested information. Johnson Consulting representatives testified that they needed this information to perform an "apples to apples" comparison of the applicants' financial data. WPC was not asked to provide any additional information or clarifications.

A public hearing was held the following week. Each applicant was given equal time to present their proposals and respond to questions and comments. In its own presentation, Johnson Consulting portrayed WPC's proposed purchase price as $5.625 million (the appraised value). A small notation specified that WPC's offer was +/- 15% of the appraised value, but Johnson Consulting did not provide that range.

A few weeks later, Lakeside emailed the City's general email address for casino-related matters seeking to enter into a memorandum of understanding with the City. Under its

terms, Lakeside's original offer would stand if it was the only applicant certified to the Gaming Board. But if the City certified multiple applicants, Lakeside would adjust its bid to match the applicant offering less money to the City. This email was forwarded to multiple City officials, including the City's corporation counsel Robert Long. Long did not forward the email to anyone and did not disclose it to the Gaming Board even though he was statutorily required to. Long testified that he did not read the memorandum of understanding and disregarded it to avoid prejudicing the application process. He said that Lakeside was looking for a "leg up" and that he did not think that he or any other City official had authority to grant the request. WPC suggests that Long concealed this email from the City Council to benefit Lakeside.

The same day Lakeside sent its memorandum of understanding, WPC delivered a letter to the City seeking to increase its proposed purchase price to $12 million. Based on Johnson Consulting's presentation at the hearing, WPC was concerned that the City had misconstrued its offer price. Long advised Johnson Consulting not to consider this letter in its analysis. He testified that it would have been difficult to properly compare the candidates' original proposals and any enhanced offers, so he instructed Johnson Consulting to exclude all supplemental information that the City did not specifically request. WPC says this directive was part of an orchestrated effort to prevent it from putting forward the best proposal possible.

The City Council met to decide which proposals to certify. Johnson Consulting presented its findings at the meeting. Per the City's instruction, its analysis did not reflect WPC's supplemental letter or Lakeside's memorandum of

understanding, though the City Council was informed of
WPC's revised offer. Johnson Consulting reported that each
applicant was qualified with the necessary skills to deliver the
casino. Still, it ranked Full House first, followed by Lakeside,
then Rivers, and WPC in last place. WPC believes that this
ranking was predetermined by Cunningham to diminish its
chances of certification. It also says that Johnson Consulting
concealed negative financial information about Full House to
bolster its report. Each council member testified that the
presentation had no influence on their decision, however, and
some were altogether unimpressed with it. Johnson Consult-
ing representatives could not articulate their ranking method-
ology when asked later.

The City Council voted to certify Lakeside, Full House,
and Rivers to the Gaming Board for licensing consideration.
It did not certify WPC. All four council members with pur-
ported ties to Bond voted against WPC and in favor of the
others. Each testified that they voted independently and with-
out outside influence, though WPC disputes the truth of that
testimony. They supplied various reasons for their decision
not to certify WPC. These included the lack of an entertain-
ment center and other amenities for economic development,
the quality of WPC's presentation, and the lack of detail and
transparency regarding WPC's proposed purchase price. One
of the so-called Bond-backed council members, Keith Turner,
testified that it bothered him that WPC seemed to expect cer-
tification because they were a Native American tribe, despite
having the lowest purchase price of all the applicants. That
said, Turner also testified that Cunningham approached him
just before the vote and explicitly directed him to certify
Lakeside, Rivers, and Full House, but not WPC. Turner

admitted that he voted as he did in part because of this instruction.

Out of the remaining five council members, three were against any casino in Waukegan and voted against every applicant. With only two votes in its favor, WPC's proposal was not certified. WPC successfully obtained reconsideration of the vote a few days later, but the City Council once again declined to certify it.

WPC lodged a complaint against the City in Illinois state court. Its first amended complaint alleged violations of the Illinois Gambling Act, the Illinois Open Meetings Act, and the Equal Protection Clause of the Fourteenth Amendment under 42 U.S.C. § 1983. The City removed the case to federal court based on federal question and supplemental jurisdiction. While this case was pending, the Gaming Board issued the casino license to Full House.

The district court granted the City's motion for summary judgment. Expanding on the Supreme Court's decision in *Inyo County v. Paiute-Shoshone Indians of the Bishop Community of the Bishop Colony*, 538 U.S. 701 (2003), the district court concluded that WPC could not maintain a § 1983 claim as an arm of a sovereign Native American tribe. In the alternative, it determined that WPC's class-of-one equal protection claim failed as a matter of law because WPC was not similarly situated to the other applicants and multiple conceivable rational bases existed for the City's conduct. The district court declined to retain supplemental jurisdiction over the remaining state law claims and entered final judgment for the City. This appeal followed.

II

WPC seeks reversal on all fronts. According to WPC, the district court erred when it held that tribes could never bring § 1983 claims. It contends that *Inyo County* allows tribes to use § 1983 to vindicate non-sovereign rights and characterizes its equal protection claim as decidedly non-sovereign. WPC then argues that summary judgment on its class-of-one claim was improper because a reasonable jury could find that the City irrationally discriminated against it throughout the application process to benefit Lakeside. We review the grant of summary judgment de novo. *LoBianco v. Bonefish Grill, LLC*, 94 F.4th 675, 677 (7th Cir. 2024). We will affirm if there is no genuine dispute of material fact and the City is entitled to judgment as a matter of law. *FKFJ, Inc.*, 11 F.4th at 584.

A

As a threshold matter, WPC must be able to sue under § 1983 to bring its claim. In *Inyo County*, the Supreme Court determined that tribes are not persons capable of suing under § 1983 to vindicate sovereign rights. 538 U.S. at 712. That decision involved the Bishop Paiute Tribe's attempt to "vindicate its status as a sovereign immune from state processes under federal law" after a search warrant was used to obtain records from a tribally operated casino. *Id.* at 706. The Court held that the Tribe did not qualify as a person capable of suit under § 1983 "in the situation here presented." *Id.* at 704.

In reaching this conclusion, the Court assumed that tribes, like states, "are not subject to suit under § 1983." *Id.* at 709. But its analysis did not end there. Rather, the Court determined that "qualification of a sovereign as a 'person' who may maintain a particular claim for relief depends not upon a bare

analysis of the word 'person' but on the 'legislative environment' in which the word appears." *Id.* at 711 (citations omitted). The Court opined that § 1983 "was designed to secure private rights against government encroachment, not to advance a sovereign's prerogative to withhold evidence relevant to a criminal investigation." *Id.* at 712 (citation omitted). Because the claim of immunity was "by virtue of the Tribe's asserted 'sovereign' status," the Court held that it could not sue "to vindicate the sovereign right it here claims." *Id.* at 711–12.

*Inyo County* left the door open to the possibility that tribes could maintain § 1983 suits predicated on non-sovereign rights. The district court shut that door. Its decision emphasized that sovereign tribes are immune from suit under the statute. Because they are not persons capable of being sued under § 1983, the court reasoned, they must not be persons capable of bringing suit either. Viewing WPC as an arm of the Potawatomi, the court deemed it unable to bring its § 1983 action and granted summary judgment to the City.

WPC does not meaningfully dispute its status as an arm of the Potawatomi, nor can it. WPC is wholly owned and funded by the Potawatomi. Its casino would be operated on behalf of the Potawatomi as a sovereign entity to the benefit of its tribal members (and exempt from federal income tax as a result). Given this financial relationship and its background, business purpose, and operational structure, WPC is squarely an arm of the Potawatomi able to avail itself of the Tribe's sovereign immunity. *Mestek v. LAC Courte Oreilles Cmty. Health Ctr.*, 72 F.4th 255, 259–60 (7th Cir. 2023).

We have yet to determine whether tribes, or their arms, can sue to vindicate non-sovereign rights under § 1983. Courts have grappled with this issue since *Inyo County*. On

one hand, it is a foundational principle of statutory interpretation that a term is presumed to have the same meaning throughout a statute. *Brown v. Gardner*, 513 U.S. 115, 118 (1994). This presumption is "at its most vigorous when a term is repeated within a given sentence." *Id.* Indeed, § 1983 references both persons who may be sued and persons who may sue in the same breath. Building off this presumption and sovereign immunity to suit under § 1983, the Fourth Circuit has found that an arm of the state is incapable of maintaining § 1983 actions regardless of the nature of its claims. *Va. Off. for Prot. & Advoc. v. Reinhard*, 405 F.3d 185, 189–90 (4th Cir. 2005) (analyzing *Inyo County*'s implications in the context of a state agency and finding no "evidence of statutory intent to allow suits by sovereigns under § 1983 that would overcome the general presumption that 'person' in a statute does not include the sovereign"). In a similar vein, the Tenth Circuit has remarked that "a 'person' within the meaning of § 1983 possesses neither 'sovereign rights' nor 'sovereign immunity.'" *Muscogee (Creek) Nation v. Okla. Tax Comm'n*, 611 F.3d 1222, 1236 (10th Cir. 2010).

On the other hand, this reasoning renders *Inyo County*'s painstaking analysis of the "legislative environment" of the word "person" and the sovereign/non-sovereign rights distinction entirely gratuitous. The Sixth Circuit recognized as much when it dispensed with a similar argument. *Keweenaw Bay Indian Cmty. v. Rising*, 569 F.3d 589, 596 & n.5 (6th Cir. 2009). For their part, the Ninth and Tenth Circuits seem to recognize the sovereign rights divide but have not affirmatively held that tribes can sue to vindicate non-sovereign rights. *Muscogee (Creek) Nation*, 611 F.3d at 1234–36; *Skokomish Indian Tribe v. United States*, 410 F.3d 506, 514–15 (9th Cir. 2005). To add even more confusion to the mix, tribes have mounted

attempts to bring § 1983 suits as parens patriae to enforce quasi-sovereign rights, with varying degrees of success. Compare *Dep't of Health & Soc. Servs. v. Native Vill. of Curyung*, 151 P.3d 388, 399–402 (Ala. 2006) (permitting parens patriae action), with *Chemehuevi Ind. Tribe v. McMahon*, 934 F.3d 1076, 1082 (9th Cir. 2019) (finding parens patriae action inconsistent with § 1983).

This is a difficult question that should not be taken lightly given its significant implications for federalism and tribal governance. However, we need not answer it today because WPC's claim would fail on the merits if allowed to proceed.

B

WPC attempts to vindicate its Fourteenth Amendment equal protection rights through § 1983. It invokes the so-called class-of-one theory, which "on some rare occasions" enables a plaintiff to succeed on an equal protection claim even if they are not a member of a protected class. *Ind. Land Tr. #3082 v. Hammond Redevelopment Comm'n*, 107 F.4th 693, 698 (7th Cir. 2024). "To state a claim under this theory, a plaintiff must allege (1) that they have been intentionally treated differently from others similarly situated, and (2) that there is no rational basis for the difference in treatment." *Id.* (cleaned up). This is a "heavy burden." *FKFJ, Inc.*, 11 F.4th at 588.

The district court determined that WPC was not similarly situated to the other casino applicants given the differences in their proposals and experience. It then identified six conceivable rational bases for the City's decision not to certify WPC's proposal. Along with the reasons given by various council members, the court noted the large size of the proposed casino compared to the lower-income Waukegan market,

WPC's lack of experience relative to the other candidates, and potential competition concerns considering Waukegan's proximity to the Potawatomi's Milwaukee casino.

WPC urges that the district court had its argument all wrong. It says the City's disparate treatment and irrational conduct occurred *throughout* the casino review process, not just when the City Council voted on its proposal. Therefore, we should begin our analysis at the start of the application process and disregard the differences in the various proposals when considering whether the applicants are similarly situated. In WPC's telling, it is similarly situated to the other casino applicants in all material respects because, according to Johnson Consulting, they were all qualified and able to deliver the casino.

To support its theory, WPC contends that the City acted irrationally when it permitted Full House to supplement its financial information and concealed the supposedly illusory nature of Lakeside's offer but prohibited WPC from revising its purchase price. It cites the omission of Full House's negative financial information as further evidence of a contrived review process. WPC also stresses that Turner's testimony about his conversation with Cunningham before the vote allows us to infer that the other so-called Bond-backed council members similarly voted according to Cunningham's instruction. This, WPC insists, leads to the inference that Cunningham and the City corrupted the entire application process and manipulated what information was available to the City Council to ensure that WPC, Lakeside's strongest competition, was not certified to the Gaming Board. WPC asserts that this inferential pileup is sufficient to permit a rational jury to find in its favor.

WPC asks too much. When evaluating class-of-one claims, we consider "only whether a conceivable rational basis for the difference in treatment exists." *Hammond Redevelopment*, 107 F.4th at 698 (quotation omitted). It is immaterial whether we examine the vote itself or look at the entire review process and its treatment of supplemental information. A conceivable rational basis exists for the City's conduct, so WPC's claim must fail.

As the district court noted, there are several plausible reasons for the City's decision not to certify WPC's proposal. We are not imagining these justifications—council members supplied many of them. WPC argues that these reasons are not conceivable in light of Turner's conflicting testimony, so we are allowed to consider animus and improper motive. At bottom, this is an attempt to negate the proffered rational bases by arguing an improper motive.

Our recent decisions could not have been more clear: "It is only when courts can hypothesize no rational basis for the action that allegations of animus come into play." *Id.* (quotation omitted). It does not have to be "the actual justification" for the different treatment. *145 Fisk, LLC v. Nicklas*, 986 F.3d 759, 771 (7th Cir. 2021) (quotation omitted). Once a reason is identified, "[t]rue or not, we may look no further." *Hammond Redevelopment*, 107 F.4th at 698–99. WPC's endeavor to undercut the district court's rational bases does not save its claim.

Regardless, WPC has not established a material factual dispute that would defeat summary judgment. To be sure, it may be disputed whether Turner voted independently or according to Cunningham's instruction. But even if Cunningham directed Turner to vote a certain way and he obliged, WPC is not entitled to the string of inferences it requests. The

bridge from a single council member's inconsistent testimony to a City-wide scheme rigged against WPC to benefit Lakeside and Bond is built on speculation and conjecture. "Speculation cannot create a genuine issue of fact that defeats summary judgment. And speculation is insufficient to defeat a summary judgment motion." *Flowers v. Kia Motors Fin.*, 105 F.4th 939, 946 (7th Cir. 2024) (citation omitted).

The claim also fails to the extent that WPC tries to characterize the disparate treatment as the City's conduct throughout the casino review process, namely its treatment of supplemental information. We need not imagine a rational basis for this decision either. Johnson Consulting did not consider WPC's revised offer because the City did not request it. By contrast, the City required additional information from Full House to properly compare the proposals. WPC did not even experience different treatment in this regard: Lakeside's memorandum of understanding was similarly disregarded, not to benefit Lakeside but because the request was futile and inappropriate. The same goes for WPC's claim that Johnson Consulting concealed negative financial information about Full House. Even taking that as true, WPC cannot assert disparate treatment because Rivers would have been similarly disadvantaged by that conduct. *FKFJ, Inc.*, 11 F.4th at 588 (class-of-one claims protect from government action "singling out just one person for different treatment for arbitrary and irrational purposes") (quotation omitted).

WPC says that, at summary judgment, its theory of the case requires us to discredit the City's testimony on these points. But it provides no evidence disputing the facts beyond its theory of animus. To properly establish a dispute of material fact, WPC must present evidence based on personal

knowledge setting forth specific facts showing a genuine issue for trial. *Johnson v. Adv. Health & Hosp. Corp.*, 892 F.3d 887, 901 (7th Cir. 2018). And while we take reasonable inferences in WPC's favor, "we need not draw 'every conceivable inference'" it requests. *FKFJ, Inc.*, 11 F.4th at 585 (quotation omitted). Theories do not create genuine factual disputes, and they do not permit us to make the sort of credibility determinations that WPC seeks. See *id.* And again, under our precedent, WPC is not able to undercut the conceivable rational bases by alleging animus.

The myriad rational bases for the City's conduct are "independent, sufficient reason[s]" for affirming summary judgment. *Hammond Redevelopment*, 107 F.4th at 698. But WPC has failed to identify a similarly situated comparator who was treated more favorably, anyway. The casino applicants and their proposals varied in many important respects. And at least one significant difference emerges if we focus our gaze, as WPC insists, on the start of the review process and what supplementation was allowed: the City needed additional information from Full House, but not WPC. WPC's class-of-one claim fails under either prong.

The City's casino review process may have been flawed. But the absence of perfection in a process does not prove intentional discrimination, nor does a "tapestry" of potentially culpable facts strung together by a theory. *FKFJ, Inc.*, 11 F.4th at 591, 593. The bar is intentionally high for class-of-one plaintiffs, and WPC does not reach it.

AFFIRMED

SCUDDER, *Circuit Judge*, concurring. I agree with and join the majority's opinion in full. I write separately to expand on and highlight the importance and difficulty of the question properly saved for another day—whether an Indian tribe or its corporate affiliate may bring suit pursuant to 42 U.S.C. § 1983. That future day and case will come and, in the meantime, the judiciary (and ultimately the Supreme Court) would be well-served by *amicus curiae* and legal scholars affording the issue the careful consideration it deserves.

**I**

As the majority opinion observes, today's law provides some, though not complete, guidance on whether an Indian tribe or its corporate affiliate may bring suit under § 1983. We know that tribes cannot bring a § 1983 action to vindicate a sovereign right. That is the holding of *Inyo County v. Paiute-Shoshone Indians of the Bishop Community of the Bishop Colony*, 538 U.S. 701 (2003). But what the Justices have yet to resolve is whether § 1983 allows a tribe to pursue claims that could be brought by nonsovereign, private individuals and entities.

In *Inyo County* the Supreme Court addressed whether a tribe and its wholly owned gaming corporation could sue under § 1983 to prevent non-tribal law enforcement officers from executing state-issued search warrants to seize tribal records. Section 1983, the Court explained, "was designed to secure private rights against government encroachment, not to advance a sovereign's prerogative to withhold evidence relevant to a criminal investigation." *Id.* at 712 (citation omitted). On this reasoning, it held that an Indian tribe "may not sue under § 1983 to vindicate" a "sovereign right," such as the right to sovereign immunity. *Id.* But the Court left open the possibility that § 1983 might authorize suit by a tribe where

the asserted right is one that nonsovereigns could bring under similar circumstances. It suggested, for example, that the result might have been different had the tribe claimed that the warrant at issue lacked probable cause—a Fourth Amendment violation actionable via § 1983 by an individual tribe member or other private person. See *id.* at 711–12.

While the Court purported to resolve the case on the grounds that a tribe does not qualify as a "person" within the meaning of § 1983 when it seeks to vindicate sovereign immunity affirmatively as a plaintiff, see *id.* at 704, *Inyo County* might be better understood as holding that sovereign immunity is not a "right" actionable under the statute. Indeed, that was Justice Stevens's view. See *id.* at 713 (Stevens, J., concurring in the judgment). *Who* can bring a § 1983 action and for the violation of which *rights* are two distinct questions.

In applying *Inyo County* in later cases, the panel opinion recognizes that other circuits have focused on the nature of the right asserted to determine whether an Indian tribe is a suitable § 1983 plaintiff. See, *e.g.*, *Skokomish Indian Tribe v. United States*, 410 F.3d 506, 514–16 (9th Cir. 2005) (en banc) (holding that a tribe may not assert treaty-based rights under § 1983); *Keweenaw Bay Indian Cmty. v. Rising*, 569 F.3d 589, 596 & n.5 (6th Cir. 2009) (suggesting that a tribe can bring a § 1983 claim where the rights at issue can be vindicated by "private, nonsovereign entities"); *Muscogee (Creek) Nation v. Okla. Tax Comm'n*, 611 F.3d 1222, 1234–36, 1235 n.11 (10th Cir. 2010) (explaining that "the viability of a tribe's § 1983 suit depended on whether the tribe's asserted right was of a sovereign nature" and holding the tribe was not a "person" where its claim sought "to vindicate [its] status as a sovereign immune from [the state]'s cigarette state tax enforcement scheme"); *Becker v.*

*Ute Indian Tribe of the Uintah & Ouray Rsrv.*, 868 F.3d 1199, 1205–06 (10th Cir. 2017) (upholding dismissal of a § 1983 claim where the right asserted was "at its core, the right of tribal sovereignty"). In short, these courts all determined that the claim at issue involved a sovereign right (or remanded for the district court to conduct that inquiry), so they did not need to proceed past *Inyo County*.

Here, the district court held that *Inyo County* prevented Waukegan Potawatomi Casino from bringing a class-of-one equal protection claim pursuant to § 1983—concluding that it is a "Gordian knot to untangle [WPC's] sovereign status and conspicuously sovereign interests in getting certified for a casino license from its putative 'non-sovereign' interests." *Waukegan Potawatomi Casino, LLC v. City of Waukegan*, No. 20-cv-00750, 2024 WL 1363733, at *7 (N.D. Ill. Mar. 29, 2024). Today's opinion properly and carefully declines to resolve whether this § 1983 action seeks to vindicate a sovereign right or a private right. A future case, however, is sure to require us to answer the question left unresolved by *Inyo County*.

## II

Where an Indian tribe does not assert a sovereign right—and *Inyo County* consequently does not bar the claim—its ability to bring a § 1983 action presents a difficult question. In determining "whether a legislatively conferred cause of action encompasses a particular plaintiff's claim," the Supreme Court has instructed us to apply "traditional principles of statutory interpretation" and ask whether the plaintiff "fall[s] within the zone of interests protected by the law invoked." See *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 127–29 (2014) (citation omitted). So we begin, as always, with the text of the statute. Section 1983 provides:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress ….

42 U.S.C. § 1983.

By its terms, a tribe can only be a § 1983 plaintiff if it is a "person within the jurisdiction [of the United States]." But Congress did not define in the statute who qualifies as a "person" or what it means to be "within the jurisdiction" of the United States. So looking to the statute's broader context and purpose, a court must reason from first principles to discern the meaning of these two provisions.

A

The cardinal rule of statutory interpretation is that words in a statute take their "ordinary, contemporary, common meaning." *Delaware v. Pennsylvania*, 598 U.S. 115, 128 (2023) (quoting *Sandifer v. U.S. Steel Corp.*, 571 U.S. 220, 227 (2014)). This analysis is often informed by dictionaries and, where relevant, the Dictionary Act.

Congress enacted the Dictionary Act just two months before the Civil Rights Act of 1871—the original version of § 1983. The Dictionary Act provided that "the word 'person' may extend and be applied to bodies politic and corporate … unless the context shows that such words were

intended to be used in a more limited sense." Act of Feb. 25, 1871, § 2, 16 Stat. 431. In *Monell v. Department of Social Services* the Court relied on this definition to conclude that municipalities are a suable "person" within the meaning of § 1983. See 436 U.S. 658, 688–89 (1978). If the public understanding of the terms "bodies politic and corporate" at the time of § 1983's enactment also included Indian tribes, then that may suggest they are persons entitled to bring suit.

Since an Indian tribe has sovereign status, the inquiry might also take direction from how § 1983 otherwise treats states in the Union. We have determined that states cannot bring a § 1983 claim. See *Illinois v. City of Chicago*, 137 F.3d 474, 477 (7th Cir. 1998). And one of our fellow circuits has held that the same is true of state agencies. See *Va. Off. for Prot. & Advoc. v. Reinhard*, 405 F.3d 185, 189–90 (4th Cir. 2005). But states and tribes are sovereigns of a different type. The "sovereignty that the Indian tribes retain," the Supreme Court has emphasized, "is of a unique and limited character." *United States v. Cooley*, 593 U.S. 345, 349 (2021) (quoting *United States v. Wheeler*, 435 U.S. 313, 323 (1978)). So perhaps the same principles need not control.

Whether an Indian tribe can bring a § 1983 action as a plaintiff might also be informed by a related question: whether a tribe is subject to liability as a § 1983 defendant. A tribe is protected by sovereign immunity. This immunity, the Supreme Court has held, extends to suits arising from a tribe's commercial activities and is only abrogated where Congress does so "unequivocally." *Michigan v. Bay Mills Indian Cmty.*, 572 U.S. 782, 790 (2014) (citation omitted). In *Will v. Michigan Department of State Police* the Court concluded that the text of § 1983 did not contain the requisite clear abrogation of

sovereign immunity—at least when it comes to states. See 491 U.S. 58, 65 (1989). And, in *Inyo County*, the Court assumed that tribes are similarly not "person[s]" subject to a § 1983 suit. See 538 U.S. at 708 (citing *Kiowa Tribe of Okla. v. Mfg. Techs., Inc.*, 523 U.S. 751, 754 (1998)).

Section 1983 uses the word "person" to describe both those who can sue and those who are subject to liability under the statute. And courts "generally presume that 'identical words used in different parts of the same [statute] are intended to have the same meaning.'" *United States v. Cleveland Indians Baseball Co.*, 532 U.S. 200, 213 (2001) (quoting *Atl. Cleaners & Dyers, Inc. v. United States*, 286 U.S. 427, 433 (1932)). Relying on this presumption, the district court here reasoned that a tribe "cannot both benefit from the immunities of § 1983 as a potential defendant as well as its protections as a potential claimant." *Waukegan Potawatomi Casino*, 2024 WL 1363733, at *7.

But remember that the *Inyo County* Court declined to rest its decision on the basis that a tribe is not a "person" subject to suit under § 1983. See 538 U.S. at 710–11. It explained that whether a sovereign qualifies as a "'person' who may maintain a particular claim for relief depends not upon a bare analysis of the word 'person,' but on the legislative environment in which the word appears." *Inyo County*, 538 U.S. at 711 (internal quotation marks omitted) (citations omitted). This implies that a proper dimension of the analysis requires assessing what Congress intended in enacting § 1983.

Congress enacted § 1 of the Civil Rights Act of 1871—the precursor to § 1983—"for the express purpose of 'enforc[ing] the Provisions of the Fourteenth Amendment,'" *Mitchum v. Foster*, 407 U.S. 225, 238 (1972) (quoting Act of April 20, 1871,

17 Stat. 13), "in response to the widespread deprivations of civil rights in the Southern States and the inability or unwillingness of authorities in those States to protect those rights or punish wrongdoers," *Felder v. Casey*, 487 U.S. 131, 147 (1988) (citing *Patsy v. Bd. of Regents*, 457 U.S. 496, 503–05 (1982)). The Supreme Court has underscored that Congress intended the enactment "to provide a remedy, to be broadly construed, against all forms of official violation of federally protected rights." *Monell*, 436 U.S. at 700–01; see also *Wyatt v. Cole*, 504 U.S. 158, 161 (1992) (explaining that the "purpose of § 1983 is to deter state actors from using the badge of their authority to deprive individuals of their federally guaranteed rights and to provide relief to victims if such deterrence fails").

A broad construction of § 1983 might allow a tribe to bring suit wherever it has been deprived of a right protected by federal law. But the Court has, in other contexts, restricted the scope of the remedy available under § 1983—for example, by holding that states are not suable "persons," limiting which violations of law amount to a "right," and incorporating the common law doctrine of qualified immunity. See, *e.g.*, *Will*, 491 U.S. at 64–66 (finding that a state is not a "person" subject to suit under § 1983); *Gonzaga Univ. v. Doe*, 536 U.S. 273, 290 (2002) (explaining that, "if Congress wishes to create new rights enforceable under § 1983, it must do so in clear and unambiguous terms"); *Health & Hosp. Corp. of Marion County v. Talevski*, 599 U.S. 166, 180 (2023) (reaffirming that "[s]tatutory provisions must *unambiguously* confer individual federal rights" to be actionable under § 1983); *Vega v. Tekoh*, 597 U.S. 134, 141 (2022) (holding that a *Miranda* violation does not provide a basis for a § 1983 claim); *Pierson v. Ray*, 386 U.S. 547, 555 (1967) (concluding that the § 1983 legislative record "gives no clear indication that Congress meant to abolish wholesale

all common-law immunities"); *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011) (explaining that, to defeat qualified immunity, "existing precedent must have placed the statutory or constitutional question beyond debate"); *Kisela v. Hughes*, 584 U.S. 100, 104 (2018) (per curiam) (emphasizing that "immunity protects all but the plainly incompetent or those who knowingly violate the law" (citation omitted)).

Against this backdrop, whether Congress intended the statute to authorize lawsuits brought by Indian tribes is not an easy question.

B

Similar interpretive difficulty arises in determining whether an Indian tribe is a person "within the jurisdiction of" the United States for purposes of § 1983. We must "orient ourselves," again, "to the time of the statute's adoption." *Bostock v. Clayton County*, 590 U.S. 644, 655 (2020).

In April 1870, following the ratification of the Fourteenth Amendment, the Senate instructed its Judiciary Committee to "report to the Senate the effect of the fourteenth amendment to the Constitution upon the Indian tribes of the country; and whether by the provisions thereof the Indians are not citizens of the United States." S. Rep. No. 41-268, at 1 (1870). The Committee produced a report concluding that "the Indian tribes within the limits of the United States, and the individuals, members of such tribes, while they adhere to and form a part of the tribes to which they belong, are not, within the meaning of the fourteenth amendment, '*subject to the jurisdiction*' of the United States." *Id.* at 10–11. Only four months after the Committee released this report, Congress—pursuant to its

authority to enforce the Fourteenth Amendment—enacted the Civil Rights Act of 1871.

Just over a decade later, in 1884, the Supreme Court held that children of members of an Indian tribe are not "born in the United States and subject to the jurisdiction thereof" within the meaning of § 1 of the Fourteenth Amendment. *Elk v. Wilkins*, 112 U.S. 94, 102–03 (1884). The import of the 1870 Senate Judiciary Committee report did not go unnoticed. In his dissenting opinion, Justice Harlan quoted from the report to support his conclusion that the Amendment did grant citizenship to individuals who severed relations with their tribe and, therefore, had subjected themself to the jurisdiction of the United States. See *id.* at 110, 118–19 (Harlan, J., dissenting).

To be sure, the phrases "within the jurisdiction of the United States" as used in § 1983 and "subject to the jurisdiction of the United States" within the meaning of the Fourteenth Amendment are not identical. But this history nevertheless provides some reason to doubt that the enacting Congress would have considered tribes to be within the jurisdiction of the United States for purposes of § 1983.

This inquiry, however, might also be informed by an analysis of Congress's power over Indian affairs. See *Haaland v. Brackeen*, 599 U.S. 255, 272–76 (2023) (describing the sources of Congress's power to legislate with respect to Indian tribes). The Court has characterized this authority as "plenary and exclusive" and "muscular," which might suggest the opposite conclusion. *Id.* at 272–73 (collecting cases).

### III

Whether an Indian tribe can bring a § 1983 action after *Inyo County* is a question as difficult as it is important. Tribes, like

natural persons and corporations, have rights protected by federal law. See, *e.g.*, *Washington v. Confederated Bands & Tribes of Yakima Indian Nation*, 439 U.S. 463, 499–502 (1979) (allowing tribes to bring an equal protection challenge to state jurisdictional classifications); *United States v. Sioux Nation*, 448 U.S. 371, 424 (1980) (requiring the federal government to pay just compensation for taking of tribal property). And everyone considering these issues is sure to recall Chief Justice Marshall's oft-quoted observation that "it is a general and indisputable rule[] that where there is a legal right, there is also a legal remedy … whenever that right is invaded." *Marbury v. Madison*, 5 U.S. (1 Cranch) 137, 163 (1803) (quoting 3 W. Blackstone, Commentaries *23). But as Chief Justice Marshall also recognized, tribes occupy a distinct status in the American system of government. "The condition of the Indians, in relation to the United States," he wrote, "is perhaps unlike that of any other two people in existence." *Cherokee Nation v. Georgia*, 30 U.S. (5 Pet.) 1, 16 (1831).

Answering this question thus implicates unique considerations and impacts several fundamental areas of law. Yet it must await resolution another day in a different case. With these concurring observations, I join today's opinion.